E. LAWRENCE PRICE AND ELAINE PRICE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 26907-83, 35647-83,     Filed April 9, 1987.
35838-83.

---

[21] $7,750 \times \dfrac{\$37,500 \text{ (excludable from income)}}{\$75,000 \text{ (total settlement payment)}} = \$3,875.$

[1] Cases of the following petitioners are consolidated herewith: E. Lawrence and Elaine Price, docket No. 35647-83; and Lonnie E. and Steffie Price, docket No. 35838-83.

*Allen Barry Witz*, *Durward James Gehring*, *Andrew B. David*, and *Patricia Boldra*, for the petitioners.[2]

*Edward J. Roepsch* and *Jeffrey N. Kelm*, for the respondent.

JACOBS, *Judge*: Respondent determined the following deficiencies in income tax and additions to tax:

| Docket No. | Year | Petitioners | Deficiency | Addition to tax sec. 6653(b)[3] |
|---|---|---|---|---|
| 26907-83 | 1978 | E. Lawrence and Elaine Price | $67,717 | $33,921 |
| 5647-83 | 1979 | E. Lawrence and Elaine Price | 3,081,827 | 1,540,913 |
| 35838-83 | 1979 | Lonnie E. and Steffie Price | 337,867 | 168,933 |

In his answers to the petitions filed in this case, and amendments thereto, respondent claimed increased deficiencies and additions to tax, as follows:

---

[2]An amicus curiae brief was filed by David D. Aughtry and David E. Hammer as counsel for E.J. Hudson and unnamed others.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

| Docket No. | Increased deficiency | Increased addition to tax |
|---|---|---|
| 26907-83 | $193,394 | $96,760 |
| 35647-83 | 35,973,948 | 17,986,974 |
| 35838-83 | 3,963,014 | 1,981,507 |

In addition, respondent seeks the increased rate of interest provided by section 6621(c), Internal Revenue Code of 1986 (previously sec. 6621(d), I.R.C. 1954) on substantial underpayments due to tax motivated transactions.

These consolidated cases relate to straddle transactions involving Government securities engaged in by partnerships (Newcomb Government Securities, Price & Co., and Magna & Co.) controlled by petitioners herein.[4] The issues for decision are:

(1) Whether Newcomb Government Securities, Price & Co., and Magna & Co. engaged in bona fide trades of Government securities; if so, then to what extent petitioners may deduct their distributive share of partnership trading losses, interest expenses, and fees incurred in those trades and to what extent petitioners must include in income their distributive share of partnership gains and interest income from such trades; and

(2) If there is an underpayment of tax, then (a) whether any part of such underpayment is due to fraud,[5] and (b) whether petitioners are liable for an increased rate of interest under section 6621(c), I.R.C. 1986.

---

[4] A straddle transaction involves the simultaneous purchase and short sale of Government securities (Treasury bills and notes). Most of the straddle transactions engaged in herein involved securities having the same face value but different maturity dates. A short sale is a sale of a security which the seller does not own, but rather borrows from another.

Treasury bills are short-term debt instruments, regularly issued by the U.S. Treasury Department for periods of 3 months, 6 months, or 1 year. They are issued at a discount from their face value, and at maturity the face amount of the bills is paid to holders thereof. The Treasury Department also issues longer term notes and bonds. References herein to amounts of Treasury bills or notes are to their face amounts.

Prior to the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 322, straddle transactions involving Government securities afforded certain tax advantages due to the fact that (1) an obligation of the United States issued on a discount basis after Mar. 1, 1941, and payable without interest at a fixed maturity date not exceeding 1 year from the date of issue (e.g., Treasury bills) was not considered a capital asset, sec. 1221(5), and (2) gain on Treasury bills was not recognized until such time as the bills matured, were sold, or were otherwise disposed of. Sec. 454(a).

[5] Respondent has conceded that no part of the underpayment of tax is due to fraud on the part of Elaine Price or Steffie Price.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation of facts and attached exhibits are incorporated herein by this reference.

### Background and Jurisdictional Facts

Petitioners E. Lawrence (Lawrence) and Elaine Price, husband and wife, and Lonnie E. (Lonnie) and Steffie Price, husband and wife, all resided in Fort Collins, Colorado, when the petitions in these consolidated cases were filed. Lawrence and Lonnie are brothers.

Price & Co., an Illinois limited partnership which was the successor of another limited partnership organized in 1976, was primarily a market maker in stock options. Lawrence and Sidney Samuels (Samuels)[6] were its general partners; Lawrence was the managing partner. During 1977, approximately $2.2 million in partnership capital was raised from 13 newly admitted limited partners who also assumed $6.6 million of the partnership's debts.

Newcomb Government Securities (Newcomb) was an Illinois limited partnership formed in 1978 by Lawrence and Elaine Price to operate as a dealer in Government securities. Lawrence, the general partner, had a 96-percent interest in Newcomb's profits, losses, and capital; Elaine had a 4-percent limited partnership interest. In June 1979, Lonnie was admitted as a general partner with a 10-percent interest; Lawrence's general partnership interest was reduced to 20 percent; and Elaine's limited partnership interest was increased to 70 percent.

Magna & Co. (Magna) was an Illinois limited partnership formed in October 1979 by Lonnie (as managing general partner) and others to operate as a market maker in stock options. By the end of 1979, it had 13 partners. Lonnie had a 2.3-percent interest in Magna's profits, losses, and capital; Lawrence had a 7.6-percent interest.

---

[6]Lawrence and Samuels severed their business relationship in 1978. Thereafter, Samuels organized First Western Government Securities, Inc., an Illinois corporation. Presently pending in this Court is a matter involving the activities of First Western Government Securities, Inc. *Thomas L. Freytag and Sharon N. Freytag, et al. v. Commissioner*, docket No. 4934-82, et al.

Price & Co., Newcomb, and Magna all were calendar year partnerships. Price & Co. and Magna accounted for income on the cash basis; Newcomb used the accrual method of accounting.

## 1978

### Price & Co. — General

In autumn 1978, Lawrence and Samuels investigated the possibility of Price & Co.'s opening a department to trade as a dealer in Government securities.[7] The idea was rejected; in lieu thereof, they sought alternative means by which Price & Co. could engage in trading Government securities. To this end, they embarked upon two different avenues almost simultaneously, as described *infra*.

### Price & Co./Sentinel Financial Instruments Transactions

Sentinel Financial Instruments (Sentinel) was a limited partnership formed in 1978 by Michael Senft (Senft)[8] and Frank Cihak to operate as a dealer in Government securities.

Around the end of November 1978, Lawrence discussed with Senft the possibility of Price & Co.'s opening a trading account with Sentinel. Lawrence informed Senft that Price & Co. desired to enter into transactions which would achieve a $10 million loss in 1978. It was agreed that Price & Co. would deposit $500,000 as margin with Sentinel and that Sentinel would invest the $500,000 in "matched repo[9]

---

[7]Prior to 1978, Price & Co. had traded in Treasury bill option spreads through Arbitrage Management; in connection therewith, it claimed over $3.2 million in losses, which were disallowed in a prior audit. See *Fox v. Commissioner*, 82 T.C. 1001 (1984).

[8]At the time Senft testified, he was in the midst of serving a prison sentence for tax evasion. He testified pursuant to a grant of immunity.

[9]Repurchase agreements (repos) and reverse repurchase agreements (reverse repos) are frequently used by dealers in Government securities, financial institutions, and others as methods for temporary cash management, interest rate arbitrage, or the borrowing of securities used in the course of a dealer's business. In a repo transaction, the first party (e.g., a dealer) sells securities (generally U.S. Treasury and Federal agency securities) to a second party (e.g., a customer) and simultaneously agrees to repurchase a like amount of the same securities at a stated price (generally greater than the original sales price) on a fixed, future date. Repo transactions, from the viewpoint of the seller (such as a dealer), provide financing to acquire newly issued Government securities or other portfolio assets; from the viewpoint of the purchaser, a repo transaction provides a means by which funds can be invested for a desired period while holding as collateral a virtually risk-free asset in the event the seller breaches its agreement to repurchase.

and resale agreements, bills, bonds and/or notes" with dealers approved by Lawrence. Sentinel was to keep $150,000 of the $500,000 margin deposit, plus all interest earned on the $500,000 deposit, as a fee for providing Price & Co. with the desired $10 million loss. The balance of $350,000 was to be returned to Price & Co. at the close of business on February 28, 1979. In accordance with the agreement, Price & Co. deposited $500,000 with Sentinel.

Purported trades (purchases and short sales)[10] between Price & Co. and Sentinel involving more than $3.85 billion in Government securities (Treasury bills) were arranged. These purported trades of Treasury bills allegedly occurred during the time periods of December 4 through 6, 1978, and December 27 through 29, 1978, and resulted in the following (from Price & Co.'s perspective):

|  | 1978 | 1979 |
|---|---|---|
| Gross trading (loss) or profit | ($15,046,076) | $56,196,056 |
| Gross trading profit or (loss) | 5,555,965 | (44,987,942) |
| Net trading (loss) or profit | (9,490,111) | 11,208,114 |
| Borrowing fee | (575,042) | (1,293,254) |
| Net profit (loss) | (10,065,153) | 9,914,860 |
| Net loss — 1978 |  | (10,065,153) |
| Overall net loss |  | (150,293) |

All the trades were predetermined;[11] Price & Co. was assured of "losing" approximately $10 million in 1978 and

---

Reverse repo transactions are the mirror images of repo transactions—securities are purchased by the first party subject to the obligation of the second party to repurchase them. Notwithstanding the first party's obligation to sell (in a reverse repo transaction) a like amount of the same securities back to the second party, the first party generally is entitled to use the securities in transactions with third parties.

A controversy exists as to whether when one purchases securities from another and simultaneously enters into a repo transaction with the seller the transaction should be characterized as a secured loan transaction (as petitioners and amicus contend) or as a purchase with a forward contract for sale (as respondent contends). We need not, and do not, decide that controversy in these cases since the "secured loan vs. purchase-forward sale" characterization would not affect our decision. However, for convenience, we shall use petitioners' characterization.

[10]The strategy of a short sale is that by the time the security is covered, the seller will have acquired the security by purchasing it on the open market at a price lower than that for which it was sold, thereby making a profit. Another way to cover a short position is to use the security obtained in a reverse repo transaction.

[11]The transactions were reflected on Sentinel computer records as follows: Price & Co. purchased (long) and sold short various Treasury bills. Price & Co.'s short sale positions were covered by Price & Co.'s borrowing the Treasury bills from Sentinel, the fee for which was paid from Price & Co.'s margin deposit. The purchase price for the long position was settled by an offset against the sale proceeds from the short position. A "long" position in a security means purchasing or obtaining a beneficial interest in a security by using borrowed funds.

recouping all but approximately $150,000 of that "loss" in 1979. From Sentinel's perspective, it was assured of receiving the prearranged fee of approximately $150,000, plus retention of the interest earned on the $500,000 margin deposit.

Sentinel returned approximately $350,000 to Price & Co. in two installments, one on February 28, 1979, and one on March 8, 1979.[12]

### Price & Co./New York Hanseatic Transaction

In November 1978, Samuels introduced Lawrence to James Ruffalo (Ruffalo), the executive vice president of Carrol, McEntee & McGinley (CM&M), a relatively small primary Government securities dealer.[13] This meeting was preliminary to an arrangement whereby Price & Co. would engage in Government security transactions with Ruffalo-procured dealers who would provide Price & Co. with up to $15 million of "losses" on transactions with little or no economic risk for a predetermined fee.

The involvement of CM&M as the dealer in prearranged transactions with Price & Co. was rejected by the outside directors of CM&M. Therefore, Ruffalo spoke with Ernest Grunebaum, the partner in charge of the New York Hanseatic division of Stuart Bros. (Hanseatic), another relatively small primary dealer in Government securities, with regard to entering into predetermined, no-market risk transactions with Price & Co. It was agreed that Hanseatic would act as the dealer in such transactions "so long as the numbers worked out."

On December 7, 1978, Ruffalo notified Lawrence of the terms of a transaction he was going to propose to Hanseatic. The proposed transaction (structured as a purchase by Price & Co. of $421 million of Treasury bills due on January 4, 1979, which was to be financed through two successive repurchase agreements) would result in Price & Co.'s "incurring" an interest expense of $1,998,068 in 1978 and

---

[12]There was no explanation why the entire $350,000 was not returned in full on Feb. 28, 1979, as promised.

[13]There are (and at all relevant times were) 36 primary dealers in Government securities that trade directly through the Federal Reserve wire transfer network. In addition to the primary dealers, there are numerous secondary dealers in Government securities. Dealers in Government securities trade both for their own account and for customer accounts.

Hanseatic's receiving a fee of $59,899.[14] Lawrence and Hanseatic agreed to this proposal.

As of the alleged trade date (December 8, 1978), there was a total of $5.706 billion of Treasury bills maturing on January 4, 1979. The $421 million in Treasury bills allegedly purchased on December 8, 1978, by Price & Co. represented approximately 7.38 percent of the Treasury bills maturing on January 4, 1979. Since the trade was prearranged, there was no need for Hanseatic to acquire (nor did it acquire) the Treasury bills allegedly sold to Price & Co.

In 1979, Hanseatic paid $44,719 (approximately 75 percent of the fee it received from Price & Co.) to the Henry Elser Partnership (Elser), of which Ruffalo was a partner, as a commission for arranging the transactions with Price & Co.

Price & Co. claimed as a deduction the $1,998,068 interest "paid" to Hanseatic on its 1978 partnership tax return.[15]

## Newcomb Government Securities

Price & Co. traded in Government securities solely for its own account; Newcomb was established in order to do tax straddles for its customers. Lawrence and Elaine Price were Newcomb's only employees in 1978.

Through Ruffalo, Newcomb allegedly engaged in three sets of straddle transactions with Hanseatic on December 20 and 21, 1978, involving trades totaling $970,170,000 in Treasury bills.[16] Hanseatic's fee for the transaction was

---

[14]Interest expense - first repo ........................................... ($1,998,068.30)
    Dec. 8, 1978, through Dec. 28, 1978
Interest expense - second repo ........................................ (761,492.89)
    Dec. 28, 1978 through Jan. 4, 1979
      Less ...................................................... (2,759,561.19)
Gain on Treasury bills (in 1979) ....................................... − 2,699,662.50
      Net loss ................................................... (59,898.69)

[15]Lawrence and Elaine Price conceded respondent's disallowance of the $1,998,068 interest deduction.

[16]The three sets of straddle transactions were as follows:

| Maturity date | Face amount purchased/sold (millions) |
|---|---|
| (1) 3/15/79 long | $173.72 |
| 2/06/79 short | 172.00 |
| (2) 3/08/79 long | 152.25 |
| 1/11/79 short | 150.00 |
| (3) 4/03/79 long | 162.20 |
| 1/18/79 short | 160.00 |
| | 970.17 |

$15,937. In each straddle transaction, Newcomb purportedly acquired from Hanseatic Treasury bills financed by a repurchase agreement. On December 29, 1978, the repurchase agreement closed. Rather than repurchasing the Treasury bills, a second repurchase agreement was immediately opened; this second repurchase agreement expired on January 2, 1979, at a price which had been agreed upon on December 20 or 21, 1978. Also on December 20, 1978, it was agreed that the Treasury bills would be resold to Hanseatic on January 2, 1979, at a specified price. In other words, the interest rate charged on the second repurchase agreement and the price at which the Treasury bills would be resold to Hanseatic on January 2, 1979, were determined by prearrangement between the parties at the time the trades allegedly were initiated (December 20 or 21, 1978), rather than by subsequent market prices.

After these transactions were arranged, on December 22, 1978, Newcomb wired Hanseatic $61,087 (as a margin deposit on the trades) and Elser $19,415 (as a commission). On January 4, 1979, after all portions of the straddle closed, Hanseatic wired Newcomb $45,150 to close Newcomb's trading account.[17]

Around the time Newcomb initiated its transactions with Hanseatic, Newcomb had received margin deposits from six customers, totaling $200,000.[18] Newcomb packaged Treasury bill straddle transactions for these six customers which mirrored its transactions with Hanseatic; however, the amount of the customers' transactions was one-third less than that between Newcomb and Hanseatic. Each step of the customer trades was done concurrently with each step of the Newcomb-Hanseatic trades.

Except for a markup in prices that Newcomb charged its customers to close the first repurchase agreement and to open and close the second repurchase agreement, the prices for opening and closing the longs, shorts, and reverse repurchase agreements between Newcomb and its customers were the same as the prices for the corresponding shorts,

---

[17]In addition, Hanseatic paid, in 1978, $7,968.50, or 50 percent of its predetermined profit of $15,937 ($61,087 − $45,150 = $15,937), to Elser as its share of "commission fees."

[18]Newcomb only had six customers in 1978.

longs, and repurchase agreements between Newcomb and Hanseatic.

Newcomb reported the following on its partnership tax return for 1978 concerning the transactions with Hanseatic and its customers:

*Dealer (Hanseatic transaction) losses*

| | | |
|---|---:|---:|
| Trading loss | | ($1,111,477.88) |
| Interest: | | |
| Repo interest expense | ($1,442,521.46) | |
| Reverse repo interest income | 1,116,233.92 | (326,287.54) |
| Loss | | (1,437,765.42) |

*Customer income*

| | | |
|---|---:|---:|
| Trading gain | | $741,843.96 |
| Interest: | | |
| Reverse repo interest income | $1,046,010.37 | |
| Repo interest expense | (744,949.35) | 301,061.02 |
| Income | | 1,042,904.98 |

Lawrence and Elaine Price reported on their joint 1978 Federal income tax return a loss of $376,097 from their partnership interest in Newcomb.[19]

## 1979

### *Price & Co.—Search and Seizure*

In February 1979, agents of the Internal Revenue Service searched the offices of Price & Co. pursuant to a search warrant obtained in connection with a criminal investigation of Price & Co.'s 1977 partnership tax return. The 1977 and 1978 books and records of Price & Co. were seized. No criminal indictments or charges resulted from this investigation.

Most of Price & Co.'s employees resigned following the search of the offices. Lonnie (who had been the operations manager of Price & Co. since October 13, 1978) thereafter assumed the additional responsibility of office manager.[20]

---

[19]Lawrence reported a loss of $373,255, and Elaine a loss of $15,552; as Elaine lacked sufficient basis for the entire loss, she was able to utilize only $2,842 on the joint return.

[20]Lonnie never finished high school. His prior business experience was as a draftsman and designer for engineering and construction firms. Lonnie started in the securities business in mid-1978 as a trade-checker for Price & Co. Lawrence wanted Lonnie to assist him in the securities business and consequently Lonnie accompanied Lawrence to numerous business meetings. At those meetings, Lonnie was a "listener" rather than a "participant."

*Newcomb Government Securities*

### Continental Bank Clearing Account

In July 1979, Newcomb opened a clearing account with Continental Bank (the bank), an institution with access to the Federal Reserve wire transfer network (the Fed wire).[21] This account was first used in connection with a transaction involving Newcomb and Hanseatic. The account was closed in December 1979, at the Bank's insistence.[22]

### Dealer Trades Generally

As the first half of 1979 neared its end, Newcomb prepared to engage in the same types of Treasury bill transactions with dealers and customers as it had in December of 1978. The dealer "numbers" were to be arranged by Ruffalo, acting as the agent for either Elser or Diversified Commissions Group (DCG).[23]

The format of the dealer side of these transactions was the same as that employed in 1978, except that Elser or DCG initiated each transaction by lending two different securities to Newcomb, for which Newcomb paid a borrowing fee. The first of the two securities borrowed (e.g., Treasury bill) by Newcomb was used to cover an alleged short sale between Newcomb and the dealer with which it traded, subject to an arrangement for Newcomb to buy the

---

[21]Treasury bills are maintained electronically as entries on the computers of the Federal Reserve Bank of New York (the Fed); they are not evidenced by physical certificates. Access to the Fed computers is through the Fed wire, and the use of the Fed wire is limited to national banks, certain commercial banks, and certain savings and loan institutions.

Where one dealer purchases Treasury bills from another, the trade must be "cleared" over the Fed wire if the dealers use different banks as clearing agents for the trade. To illustrate, where the purchasing and selling dealers have different banks, the bank of the purchaser would transfer cash from its account at the Fed through the Fed wire to the bank of the seller which would credit it to the seller's account; the bank of the selling dealer would simultaneously transfer ownership of the Treasury bill over the Fed wire through the Fed to the bank of the purchaser, which in turn would credit the purchaser's account with the bill. Through such process, when the trade cleared on the Fed wire, the bank records would verify a change in the ownership of Treasury bills. Where a trade does not clear on the Fed wire (e.g., where both dealers have the same bank), the only verification for the trade would be written confirmation slips generated by the bank. Where a trade is through a common dealer, the only verification for the trade would be the dealer's confirmation slips.

[22]Officials at the bank were apparently concerned both as to the size of the "clearing" transactions in relationship to Newcomb's capital and the fact that the clearing procedures requested by Newcomb ("grossing up" of debits and credits which gave the appearance that securities had been transferred in and out of the account when in fact only the net amount was wired out of Newcomb's account to Diversified Commissions Group or Hanseatic) differed from the bank's normal clearing procedures.

[23]DCG was comprised of essentially the same principals as Elser.

securities sold short on December 31, 1978, at a prearranged price; the securities came back to Newcomb simultaneously via a reverse repurchase agreement. Both the short sale and the reverse repurchase agreement closed on December 31, 1979, at prices previously arranged at the inception of the trade. At the end of the transaction, the dealer had the cash and Newcomb allegedly possessed the bill it borrowed, which Newcomb thereafter allegedly returned to Elser or DCG.

The second of the two securities borrowed was sent to the dealer pursuant to a repurchase agreement. Simultaneously, Newcomb allegedly purchased in 1979 the same security from the dealer subject to an arrangement to sell it back to the dealer in 1980 at a price specified at the beginning of the trade. The first repurchase agreement expired on December 31, 1979, and was replaced immediately with a second repurchase agreement (covering the same security) to run into January 1980; the rate of interest to which the underlying loan was subject (i.e., the price at which the second repurchase agreement would close) was determined at the inception of the trade, rather than on December 31. As a result of these transactions, the dealer was assured of a net profit on the transaction without exposing itself to market risk.

Between June 1979 and December 1979, Newcomb entered into 66 of these types of transactions, each with one of five dealers—Hanseatic; Elser; CM&M; Bankers Discount (a division of B.D. International Discount Corp.);[24] and Bradmar Street Brokers, Inc.[25] A listing of such transactions is set forth in Appendix A on page 889.

With respect to the trades brokered by Elser and DCG, Newcomb paid the broker (either Elser or DCG) an amount

[24]Bankers Discount was a dealer in bankers' acceptances and other investment vehicles. In 1978, it established a unit to operate as a secondary Government securities dealer. Its size in 1979 was approximately half that of the smallest of the 36 primary dealers. Sometime in October or November 1979, Ruffalo discussed with Thomas Battle, who in turn discussed with his supervisor John Lane, the opportunity for Bankers Discount to engage in trading with Newcomb on a prearranged no-risk basis for which Bankers Discount would receive a fee. At that time, Bankers Discount was in the process of winding down its Government securities position for the yearend (as of October, Bankers Discount had $650 to $700 million in straddle positions with a net market value of approximately $2 to $2.5 million) to a point where it would have no market position.

[25]Bradmar Street Brokers, Inc. was a Government securities dealer in Ontario, Canada, organized by Ron Bradley, a former employee of CM&M.

designated a "borrowing fee." In fact, no securities were borrowed from Elser or DCG by Newcomb or by the dealer for any transaction in 1979. Instead, the borrowing fees were actually commissions paid to Elser and DCG for Ruffalo's services in arranging the transactions.

### Customer Trades Generally

Although Newcomb entered into trades with its customers on a discretionary basis, the customer transactions differed according to the customer's interest-rate bias. For example, if the customer was bullish on interest rates (predicting that rates would go down, resulting in the prices of securities to rise), two-thirds of the customer's investment would be placed in bullish straddles, while one-third would be placed in bearish straddles as a hedge.

In addition to their interest-rate bias, customers would inform Newcomb as to the amount of income which they wanted deferred from 1979 to 1980; such was designated by Newcomb as the "target deferral amount." The target deferral amount determined the amount of margin that was required to be deposited by each customer. In general, Newcomb's customers expected between a 4 to 1 and 6 to 1 writeoff (e.g., a customer who made a $7,500 margin deposit could expect to receive a $30,000 to $45,000 loss).

During 1979, Newcomb had 1,010 customers from whom it received margin deposits totaling $14,138,396.

Newcomb placed its customers in straddle transactions that mirrored those it entered into with the dealers. Its profit resulted from marking up and down the prices and financing rates it charged or paid its customers, from the prices and financing rates it paid to or received from its dealers. In addition, Newcomb engaged in four trades with customers (trades 67, 68, 70, and 71 *infra*) for which there were no apparent corresponding dealer trades.

### Cash Trades
### Trade 2

In a transaction designated "trade 2," Newcomb arranged to borrow from Elser $2.5 million of Treasury securities which were cleared over the Fed wire from Elser's account at Bankers' Trust to Newcomb's account at Continental

Bank versus a $2,415,582 cash transfer from Newcomb's account. Within an hour, ownership in the securities was transferred over the Fed wire back to Elser versus a $2,407,743 cash transfer to Newcomb. The result to Newcomb from this "day trade" was a loss of $7,839, which was deducted by Newcomb on its 1979 return as a borrowing fee.

Newcomb opened the customer side of trade 2 on the same day that it borrowed the securities from Elser. However, whereas Newcomb borrowed only $2.5 million of Treasury securities, it sold $25 million of such securities to its customers, subject to a repurchase agreement. The repurchase agreement closed on December 31, 1979, resulting in interest income to Newcomb in the amount of $803,581.01.

Trade 3

On August 24, 1979, Ruffalo caused to be wired from CM&M to Newcomb's account at Continental Bank over the Fed wire $18 million of Treasury bills, maturing on November 23, 1979. Newcomb's account was charged a total of $17,564,111. On the same day, Newcomb instructed its bank to wire the bills back to CM&M, and Newcomb's account was credited $17,562,973. This "day trade" resulted in a loss of $1,138 to Newcomb which it deducted as a borrowing fee.

Also on August 24, 1979, Newcomb sold the $18 million of Treasury bills to its customers. The bills were simultaneously resold back to Newcomb by its customers through a series of repurchase agreements.

Newcomb's total gain from the customer side of trade 3 was $11,541.64.

Treasury Bill or Note Arbitrages

Newcomb engaged in 45 Treasury bill or note arbitrage transactions in 1979 with Hanseatic and 9 with Bankers Discount, all of which were by prearrangement, without risk to Hanseatic or Bankers Discount. These transactions were financed by repurchase and reverse repurchase agreements. Information with respect to these transactions is set forth in Appendix B on pages 890-893.

These 54 dealer transactions involved a total of $15.887 billion in Treasury bills and notes. Newcomb's total predetermined loss for 1979 from these trades was $71,299,343. Newcomb paid a total of $1,315,782 as fees on these transactions ($263,676 to dealers and $1,052,106 to the partnerships in which Ruffalo was a partner).

No Treasury bills or notes cleared on the Fed wire for any of these dealer or customer transactions and no Treasury bills or notes were borrowed from either Elser or DCG with respect thereto.

## Other Transactions (Bankers Discount—Trades 58-61, 63-65)

At a meeting held in December 1979, Ruffalo and Lawrence discussed the fact that Newcomb had income of approximately $82 million from 1979 customer Treasury bill straddle transactions and approximately $72 million in offsetting losses from 1979 dealer transctions. Therefore, on or about December 19, 1979, Ruffalo arranged for Newcomb to engage in a series of prearranged trades with Bankers Discount aggregating over $3 billion, whereby Newcomb would acquire positions in Treasury bills maturing on various dates in January 1980, financed by successive repurchase agreements. The amounts of the alleged Treasury bills purchased and the relationship to the total Treasury bills issued by the Treasury Department maturing on the same dates are as follows:

| Trade transaction No. | Maturity date | Face amount purchased/sold (millions) | Face amount issued (millions) | Percentage allegedly purchased |
|---|---|---|---|---|
| 58 | Jan. 3, 1980 | $475 | - - - | - - - |
| 63 | Jan. 3, 1980 | 700 | - - - | - - - |
| | | 1,175 | $5,927 | 19.825% |
| 59 | Jan. 8, 1980 | 475 | 3,705 | 12.821 |
| 60 | Jan. 10, 1980 | 475 | - - - | - - - |
| 64 | Jan. 10, 1980 | 300 | - - - | - - - |
| | | 775 | 5,961 | 13.001 |
| 61 | Jan. 17, 1980 | 475 | - - - | - - - |
| 65 | Jan. 17, 1980 | 110 | - - - | - - - |
| | | 585 | 5,942 | 9.845 |

None of these transactions were cleared on the Fed wire.

Newcomb paid Bankers Discount the following for these transactions:

| Trade transaction No. | Fee | Margin deposit |
|---|---|---|
| 58 | $3,828.11 | $3,750 |
| 59 | 4,687.64 | 3,750 |
| 60 | 4,495.40 | 3,750 |
| 61 | 1,378.80 | 3,750 |
| 63 | 6,531.78 | 3,750 |
| 64 | 3,552.20 | 3,750 |
| 65 | 700.41 | 3,750 |
| | 25,174.34 | 26,250 |

In addition, Newcomb wired DCG $150,583.33 as a commission for these transactions which Newcomb recorded on its books as a "borrowing fee."

As a result of these transactions, Newcomb deducted the following amounts as interest expense for 1979:

| Trade transaction No. | Interest expense |
|---|---|
| 58 | $1,616,006.46 |
| 59 | 1,613,707.32 |
| 60 | 1,612,787.68 |
| 61 | 1,609,568.88 |
| 63 | 1,985,703.80 |
| 64 | 849,315.70 |
| 65 | 310,787.83 |
| | 9,597,877.68 |

## Bankers Discount—Trade 62

In addition to other trades with Bankers Discount, in December 1979, Newcomb entered into a separate predetermined transaction (trade 62) involving Treasury bills and notes arranged by Ruffalo with Bankers Discount. This transaction did not involve the use of either a repurchase or reverse repurchase agreement. The amount paid by Newcomb to Bankers Discount for this transaction was $11,470.80. In addition, Newcomb paid DCG a fee of $16,817.78 in 1979 and $151,360 in 1980.

No Treasury bills or notes were cleared on the Fed wire for this transaction. On its 1979 return, Newcomb reported the following with respect to this transaction:

| | |
|---|---|
| Trading loss — T-bills | ($2,590,720.00) |
| Interest income — T-notes | 1,709,239.13 |
| Net loss | (881,480.87) |

Newcomb's gain for 1980 with respect to this transaction was $870,145. Newcomb had an overall loss of $11,335.87

after netting the 1980 gain ($870,145) against the 1979 loss ($881,480.87).

### Bradmar Street Brokers — Trade 66

On or about December 28, 1979, Ruffalo arranged a predetermined transaction involving the purchase of $40 million of Treasury notes financed by successive repurchase agreements (trade 66). As a result of this transaction, Newcomb reported on its 1979 tax return a net interest expense of $21,273.

No Treasury notes were cleared on the Fed wire with respect to this transaction. Newcomb paid Bradmar $5,000 as a "margin deposit" and DCG $24,600 as a "borrowing fee" (both in 1979) for arranging this transaction.

### Elser—Trade 39

On November 20, 1979, the Treasury Department announced that it was accepting bids on $3.2 billion of 91-day Treasury bills (maturing on February 28, 1980) to be issued on November 29, 1979. Ruffalo, acting on behalf of Elser for Newcomb, successfully bid on $10 million of such bills. Through a series of spread transactions—purchasing Treasury bills maturing on one date and selling short an equal amount of Treasury bills maturing on a different date (both for its own account and for that of its customers)—Newcomb realized a gain in 1979 from this transaction of $758.

### Customer Trades (Trades 67, 68, 70, and 71)

Newcomb engaged in four transactions (trades 67, 68, 70, and 71) with its customers involving over $1.5 billion of Treasury bills and notes. According to Newcomb's computer records, it had a 1979 gain from these four transactions of $4,053,597 and an overall gain therefrom (taking into account corresponding losses in 1980) of $304,224.

At the time Newcomb entered into these four transactions, it did not own or possess Treasury bills or notes which could have been sold to its customers. No Treasury bills or notes were cleared on the Fed wire for these customer trades.

*Magna & Co.*

Through Ruffalo, Lonnie arranged for Magna to trade in Government securities. After being informed by Lonnie of Magna's desire to "roll over" approximately $2 million of income from 1979 to 1980, Ruffalo arranged a straddle transaction involving $500 million of Treasury bills, financed by repurchase and reverse repurchase agreements, with Bankers Discount.[26] Once the transaction was arranged, Ruffalo informed Lonnie as to the total economics of the deal, including Treasury bill prices, repurchase and reverse repurchase rates, the margin deposit, and the predetermined fee to be paid to Bankers Discount.

The only amount wired to Bankers Discount from Magna was $7,500 as a margin deposit. DCG received $15,000 on December 20, 1979, from Magna for brokering the transaction.[27]

In its 1979 partnership tax return, Magna reported the following with respect to this prearranged transaction:

| | | |
|---|---:|---:|
| Trading loss — short T-bill position | | ($1,995,000) |
| Interest expense — repo | ($2,165,960) | |
| Interest income — reverse repo | 2,117,341 | |
| Net interest expense | | (48,619) |
| Net loss | | (2,043,619) |

When netted against the $2,036,533 profit for 1980,[28] Magna had an overall net loss from this trade of $7,086, exclusive of the $15,000 fee paid to DCG.

---

[26]The alleged transaction was as follows:

"On December 26, 1979, Magna purchased $500 million of Treasury bills, to mature on March 6, 1980, for $486,740,000 from Bankers Discount, in part financed by a repurchase agreement pursuant to which Magna 'borrowed' $486,732,500 from Bankers. The transactions were 'paired off' with only $7,500 (the net difference) being debited against Magna's account. On December 31, 1979, Magna closed the repurchase agreement it had opened on December 26, 1979 (the first repo) and opened a second repurchase agreement (second repo). The $488,905,960 in proceeds from the second repo were used to satisfy the $488,898,460 obligation under the closing of the first repo. The Treasury bills due to mature on March 6, 1980, were used as collateral on the second repo. Only the net difference ($7,500) between the closing of the first repo and opening of the second repo was credited to Magna's margin account."

[27]The fees paid to DCG were designated as borrowing fees. In fact, no securities were borrowed.

[28]For 1980, Magna realized the following profit from this transaction:

| | |
|---|---:|
| Gain — T-bill | $2,397,780 |
| Less: Repo interest expense | (361,247) |
| Net profit | 2,036,533 |

*1979 Tax Returns*

With the admission of Lonnie as a partner and the shifting of interests between Larry and Elaine Price on June 5, 1979, Newcomb had to close out the year as of that date, pursuant to section 708(b)(1)(B). Accordingly, Newcomb filed two returns for 1979, one covering the period January 1 through June 5, 1979 (return No. 1) and the other covering the period June 6 through December 31, 1979 (return No. 2). Return No. 1 reported ordinary income for Newcomb of $462,332; return No. 2 reported an ordinary loss of $6,129,038.

Magna reported an ordinary loss of $2,061,495, of which $2,043,619 was attributable to its trade with Bankers Discount. Of the $2,061,495 ordinary loss, Lawrence's share was $155,938, which was deducted to the extent of his basis of $150,000. Lonnie's share was $46,781 of which he deducted $45,872.

Lawrence and Elaine Price reported the following income (loss) on their 1979 joint Federal income tax return:

| | | |
|---|---:|---:|
| Wages .............................................. | | $3,600 |
| Distribution from Newcomb | | |
| in excess of basis ................................... | | 541,220 |
| Loss — Magna & Co ........................... | ($150,000) | |
| Loss — Newcomb............................... | (1,323,189) | |
| Loss — Other partnerships ..................... | (3,020) | (1,476,209) |
| Total income................................... | | (931,389) |

Lawrence received a guaranteed payment in 1979 from Price & Co. in the amount of $65,000, which was not reported on his 1979 tax return.

Lonnie and Steffie Price reported the following income (loss) on their 1979 joint Federal income tax return:

| | | |
|---|---:|---:|
| State income tax refund.................................. | | $354 |
| Consulting fees ........................................ | | 9,000 |
| Loss — Magna & Co ........................... | ($45,872) | |
| Loss — Newcomb............................... | (612,904) | |
| Loss — Twin Spruce Construction Co ............ | (336) | (659,112) |
| Total income................................... | | (649,758) |

Lonnie received a guaranteed payment in 1979 from Magna in the amount of $909, which was not reported on his 1979 tax return.

## Respondent's Contentions

### General

Respondent's principal argument is that the various trades between Newcomb, Price & Co., and Magna (on the one hand) and Senft and the Ruffalo-procured dealers (on the other) were sham transactions, devoid of economic substance. Respondent contends that such trades involved the purchase and sale of fictitious securities and that the trades were prearranged at prices which guaranteed a profit to the Ruffalo-procured dealers and a loss to the partnerships. Alternatively, respondent contends that the partnerships' purchase and short sale transactions when coupled with the simultaneous repurchase and reverse repurchase agreements were in substance forward long and forward short contracts.[29]

Respondent further contends that (1) all underpayments of tax by petitioners (other than Elaine and Steffie Price) were due to fraud and (2) petitioners are liable for an increased rate of interest under section 6621(c).

### Determination of Deficiencies

#### Lawrence and Elaine Price

#### 1978

Respondent's notice of deficiency to Lawrence and Elaine Price for 1978 determined a deficiency of $67,717. In computing the amount of such deficiency, respondent (1) netted Newcomb's 1979 dealer gains as reported on Newcomb's return No. 1 (the partnership return for the period January 1 through June 5, 1979) against its claimed 1978 dealer losses, and (2) netted all Newcomb's 1979 customer losses as reported on return No. 1 against its 1978 customer gains.[30]

In respondent's answer to the petition filed in this case, and the five amendments thereto, respondent increased the claimed deficiency by $125,677 to a total of $193,394. Respondent's claim is the result of (1) the disallowance of $1,998,068 as the 1978 repo interest expense resulting from

---

[29] A forward contract is a contract for a sale at a future date.

[30] In computing the deficiency for 1978, respondent did not include $14,728 of net income for alleged 1978 dealer and customer transactions which had a Jan. 2, 1979, settlement date.

Price & Co.'s transaction with Hanseatic (which petitioners concede); (2) the disallowance of all losses from the transaction between Price & Co. and Hanseatic, including repo interest expense and reverse repo interest income, totaling $1,166,812;[31] (3) the disallowance of the $19,415 commission paid by Newcomb to Elser; (4) the disallowance of all losses and expenses from the Price & Co. transaction with Sentinel; (5) inclusion in Newcomb's income of $110,757 as gains from customer transactions;[32] and (6) inclusion of $131,970 as Lawrence's distributive share of income from Price & Co. as a result of inventory adjustments.

### 1979

Respondent's notice of deficiency to Lawrence and Elaine Price for 1979 determined a deficiency of $3,081,827. In computing the amount of that deficiency, respondent disallowed (1) all losses with respect to the Magna trade, (2) all losses with respect to Newcomb dealer trades 58 through 65, (3) the deduction for borrowing fees with respect to all of Newcomb's trades, and (4) $259,963 claimed by Newcomb for an inventory writedown. In addition, respondent made an adjustment for Newcomb's unrealized gains as of December 31, 1979, from dealer transactions in the amount of $903,689, as determined by Newcomb's auditors.

In respondent's answer to the petition, and amendments thereto, respondent increased the deficiency by $32,892,121 to a total of $35,973,948, claiming that (1) all of Newcomb's 1979 dealer and customer trades were shams,[33] and thus

---

[31]This amount is computed as follows:

| | | |
|---|---:|---:|
| Losses from short positions that closed Dec. 29 | | ($1,111,478) |
| Interest expense from repos—accrued to Dec. 31 | ($1,171,568) | |
| Interest income from reverse repos that closed Dec. 29 | 1,116,234 | |
| Net interest expense | | (55,334) |
| Losses and net interest disallowed | | (1,166,812) |

[32]

| | | |
|---|---:|---:|
| Gain from long positions that closed Dec. 29 | | $741,844 |
| Loss from short positions that closed Jan 2 | | (1,128,655) |
| Net customer trading loss | | (386,811) |
| Interest income from reverse repos that closed Dec. 29 | $849,504 | |
| Interest income from reverse repos that closed Jan. 2 | 393,013 | |
| Interest expense from repos that closed Jan. 2 | (744,949) | |
| Net interest income | | 497,568 |
| Income from customer trades | | 110,757 |

[33]As a result of this position, respondent "removed" the adjustments for the $259,963 inventory writedown and Newcomb's $903,689 unrealized gains from dealer transactions.

none of the claimed deductions for petitioners' distributive share of Newcomb's losses or interest are allowable; (2) Lawrence and Elaine Price's distributive share of Newcomb's $82,447,466 income from customers for the period June 6, 1979, through December 31, 1979 (as reported in return No. 2), is properly includable in their 1979 income; and (3) Lawrence failed to report a guaranteed payment of $65,000 from Price & Co.[34]

## Lonnie and Steffie Price — 1979

Respondent's notice of deficiency to Lonnie and Steffie Price for 1979 determined a deficiency of $337,867. The amount of the deficiency was determined on a similar basis as that for Lawrence and Elaine Price in 1979.

In respondent's answer to the petition, and amendments thereto, respondent increased the deficiencies by $3,625,147 to a total of $3,963,014 for similar reasons as set forth above with respect to Lawrence and Elaine Price and because Lonnie failed to report a guaranteed payment of $909 from Magna.[35]

### Petitioners' Contentions

Petitioners contend "that they conducted the affairs of Newcomb, Price & Co. and Magna in a manner that was appropriate and consistent with industry standards." They argue that as a dealer in Government securities, Newcomb purchased inventory (i.e., securities) from other dealers and sold such inventory to its customers. When it purchased its inventory, claim petitioners, Newcomb entered into an agreement to return the inventory on a specified date at a preestablished price (i.e., Newcomb entered into forward commitments to return the inventory to dealers) thereby fixing its cost of goods sold. Petitioners argue that "to deny the inter-relatedness of Newcomb's dealer and customer trades is to ignore the substance of its business practice." Newcomb's use of repos and reverse repos, argue petitioners, did not affect its ability to sell inventory to

[34]Lawrence and Elaine Price concede that the $65,000 guaranteed payment is includable in income for 1979.

[35]Lonnie and Steffie Price concede that the $909 guaranteed payment is includable in income for 1979.

customers, and even though the security was pledged, Newcomb owned it and could sell it.

ULTIMATE FINDINGS OF FACT

No securities existed for: (a) Price & Co.'s transactions with Hanseatic or Sentinel in 1978; (b) Newcomb's transactions with Hanseatic, Bankers Discount, and Bradmar in 1978 and 1979, and (c) Magna's transactions with Bankers Discount in 1979.

Securities existed for Newcomb's 1979 trades 2, 3, and 39 with Elser and CM&M.

OPINION

*Losses*

The tax strategy attempted by petitioners, their partnerships, and customers of such partnerships, was to defer the recognition of income (by generating paper losses) from an earlier year (year 1) to a later year (year 2) through the use of Treasury bill straddles while obtaining interest deductions through the use of repurchase agreements. In general, the mechanics of straddles are as follows: At the end of year 1, the short position in a security is closed (i.e., the securities sold short are acquired); the long position is retained. Because Treasury bills are issued (or sold) at a discount, they appreciate in value with the passage of time (the interest element). Thus, when the short position is closed, usually there will be a loss which can be recognized (due to the fact that when the Treasury bills are subsequently acquired, they are acquired at a price higher than when sold short); however, the unrealized income (i.e., the interest element) on the long position is not recognizable until that long position is closed in year 2. After netting the unrealized appreciation on the long position with the loss on the closing of the short position, there may be little or no economic loss.

If a repurchase agreement is used to finance the long position, the seller-borrower (the party who initially receives cash for an interest in the security subject to the repurchase agreement), incurs an interest expense (the amount being the excess between the amount paid to reacquire the

security and the amount received when the security is first "sold" under the repurchase agreement) which is deductible when the repo is closed.

This tax strategy was permitted for the years at issue herein;[36] however, in order to obtain the desired tax advantages, the transactions have to be real, rather than illusory. For the reasons hereinafter set forth, we hold that the following transactions involved herein were fictitious, i.e., shams:

*For 1978*

Price & Co./Sentinel transactions;
Price & Co./Hanseatic transactions; and
Newcomb/Hanseatic transactions and related
transactions between Newcomb and its customers.

*For 1979*

Newcomb/Hanseatic transactions;
Newcomb/Bankers Discount transactions;
Newcomb/Bradmar transactions;
Magna/Bankers Discount transactions; and trades
67, 68, 70, and 71 (between Newcomb and its customers).

These transactions (except for the ones between Price & Co. and Sentinel, and Newcomb and its customers) were prearranged by Ruffalo. Ruffalo procured the dealers willing to enter into the predetermined transactions; he "worked out the numbers" and to compensate Ruffalo, fees (characterized as "borrowing fees") were paid to partnerships (e.g., Elser and DCG) in which Ruffalo had an interest. Ruffalo orchestrated the transactions with the approval of Lawrence and Lonnie and with the help of Grunebaum (for Hanseatic), Lane and Battle (for Bankers Discount), and Bradley (for Bradmar). Based on the voluminous record, we have no difficulty in finding that except as hereinafter discussed, these transactions were fictitious; the activities engaged in were simply a form of bookkeeping legerdemain. The

---

[36]Effective with respect to straddle positions established after Jun. 23, 1981, the deduction for losses on straddle positions (involving property not on a mark-to-market system) is limited to the amount by which such losses exceed unrealized gains on offsetting positions. Sec. 1092. In addition, the repo interest expense from financing long positions of a straddle must be capitalized. Sec. 263(g).

participants in these fictitious transactions purportedly borrowed, purchased, and sold billions of dollars of securities, when in fact none existed. It was as if such participants were playing a football game without the football.

From Price & Co.'s perspective, its transactions with Sentinel lacked economic substance, even assuming arguendo that the transactions were not fictitious. The transactions were arranged in order for Price & Co. to obtain a $10 million tax loss; Price & Co. could not possibly realize any economic gain from these transactions.

Section 165(a) allows a deduction for uncompensated losses sustained during the taxable year. However, the loss must be the result of a bona fide transaction (sec. 1.165-1(b), Income Tax Regs.; *Brown v. Commissioner*, 85 T.C. 968, 998 (1985)); and the transaction must be one entered into for profit. Sec. 165(c); sec. 183. In determining whether a transaction is bona fide, we must look behind the form of the transaction to determine its true economic substance. *Saviano v. Commissioner*, 765 F.2d 643 (7th Cir. 1985), affg. 80 T.C. 955 (1983). We have done so here and conclude that the Senft- and Ruffalo-arranged transactions were contrived and fictitious. This conclusion is based not on one factor, but on a combination of the following factors: (1) The size of the transactions and the lack of an apparent ability of the dealers involved (Sentinel, Hanseatic, Bankers Discount, and Bradmar) to acquire, own, or possess the amount of the securities allegedly sold; (2) the prearranged nature of the transactions to provide a specified loss to either Price & Co., Newcomb, or Magna and a profit to either Sentinel, Hanseatic, Bankers Discount, or Bradmar; and (3) the relatively small amount of margin deposits required in comparison to the magnitude of the alleged trades.[37] Since these transactions were not bona fide, the claimed deductions for the losses sustained as a result thereof, as well as for interest expense, are not allowed. See *Glass v. Commissioner*, 87 T.C. 1087 (1986).

Just as no securities existed for the dealer trades between Newcomb and Hanseatic in 1978, similarly there were no

---

[37]There was credible testimony that while no industry standard exists as to the amount of margin deposits required between dealers, a deposit of at least 1 percent of the amounts involved in the transactions would have been required had these transactions been bona fide.

securities in existence for Newcomb's corresponding trades with its customers in that year. Further, we believe that no securities existed for Newcomb's 1979 customer trades 67, 68, 70, and 71. That Newcomb might have made an economic profit in matching customer trades with the related dealer trades does not mean that the overall trades were bona fide. All that Newcomb did was "sell" its customers the flip side of fictitious transactions. The economic profit from customers was a means by which Newcomb could recoup its out-of-pocket expenses to Hanseatic, Sentinel, Bankers Discount, Bradmar, Elser, and DCG, while still claiming enormous tax deductions for itself. Since Newcomb's customer transactions were based on fictitious dealer transactions, petitioners' distributive share of Newcomb's manufactured gains and interest income therefrom is not includable in their income; however the customer deposits retained by the partnerships (Newcomb, Magna, and Price & Co.) do constitute income. Sec. 61. Further, neither the costs for the fictitious dealer securities nor the cost from related customer transactions are includable in Newcomb's inventory computations for 1978 or 1979.

*Fees*

Newcomb paid fees (however denominated) in order to have "securities" (in reality, bookkeeping entries) which could be sold to its customers. These fees (insofar as they were incurred in order to generate a profit from customers) are inextricably linked to Newcomb's trade or business and thus are deductible under section 162(a). As stated by Justice Stewart in *Commissioner v. Tellier*, 383 U.S. 687, 691 (1966):

the federal income tax is a tax on net income, not a sanction against wrongdoing. That principle has been firmly imbedded in the tax statute from the beginning. One familiar facet of the principle is the truism that the statute does not concern itself with the lawfulness of the income that it taxes. Income from a criminal enterprise is taxed at a rate no higher and no lower than income from more conventional sources. * * *

Allowing a deduction for these fees would not, in our opinion, frustrate sharply defined national or State policies. *Commissioner v. Heininger*, 320 U.S. 467, 473 (1943).

In addition to the fees paid to "acquire securities for sale to customers", Newcomb, as well as Price & Co. and Magna, paid fees in order to acquire tax losses for their own account. These fees are not deductible since they were neither a cost of doing business nor an expense incurred with an intent to make a profit independent of tax consequences. See *Forseth v. Commissioner*, 85 T.C. 127 (1985), affd. sub nom. *Mahoney v. Commissioner*, 808 F.2d 1219 (6th Cir. 1987), affd. without published opinion sub nom. *Wooldridge v. Commissioner*, 800 F.2d 266 (11th Cir. 1986), on appeal (9th Cir., Feb. 3, 1986; 5th Cir., Feb. 4, 1986; 7th Cir., Feb. 4, 1986); *Brown v. Commissioner*, 85 T.C. 968 (1985), on appeal (9th Cir., Jan. 5, 1987, and Mar. 23, 1987).

## Newcomb 1979 Transactions 2, 3, and 39

Trades 2, 3, and 39 (involving Newcomb) were unlike the other 1979 trades. They were bona fide; hence, the losses therefrom are deductible and the gains therefrom are includable in income.

## Inventory Adjustment

On its 1978 tax return, Price & Co. reported on Schedule K (Partners' Share Of Income, Credits And Deductions) $4,060,748 as an "adjustment required to correct opening inventory." The line on Schedule K on which this item appears (line 15) is titled "Other income, deductions, etc." Respondent included in Lawrence's 1978 income, $131,970 as his distributive share of this adjustment. The deficiency attributable to this inclusion as asserted by respondent was set forth in the fifth amendment to his answer; accordingly, it is a new matter for which respondent bears the burden of proof. Rule 142(a). Respondent presented no evidence regarding the nature of the "inventory adjustment" other than the 1978 return itself. There is no way of determining whether the "inventory adjustment" was treated as an item of income by Price & Co.; the adjustment was not included in the computation of Price & Co.'s income or loss for that year.

A comparison of Price & Co.'s 1978 return with its 1977 return shows that $131,970 is equal to the difference

between Lawrence's 1977 closing capital account balance and his 1978 opening balance. Thus, the 1978 "inventory adjustment" could be a correction of Lawrence's 1977 closing capital account balance. Since uncertainty exists as to whether the inventory adjustment is an income item, respondent has failed to carry his burden with respect to this matter.

## Fraud Addition

Respondent seeks the addition to tax under section 6653(b). To prevail, respondent must prove by clear and convincing evidence that some part of the underpayment of tax was due to fraud. Sec. 7454(a); Rule 142(b). To do so, he must establish that Lawrence and Lonnie intended to evade taxes believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. *Stoltzfus v. United States,* 398 F.2d 1002, 1004 (3d Cir. 1968); *Webb v. Commissioner,* 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Rowlee v. Commissioner,* 80 T.C. 1111, 1123 (1983); *Gajewski v. Commissioner,* 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. *Beaver v. Commissioner,* 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. *Stephenson v. Commissioner,* 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); *Gajewski v. Commissioner, supra,* at 200. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Spies v. United States,* 317 U.S. 492 (1943); *Gajewski v. Commissioner, supra* at 200; *Stone v. Commissioner,* 56 T.C. 213, 223-224 (1971).

Respondent has proven by clear and convincing evidence that all of Price & Co.'s, Newcomb's, and Magna's losses and expenses, in the years in question, to the extent disallowed, are due to fraud on the part of Lawrence. Lawrence knew of, and was intimately involved in, the fictitious trades, which were engaged in for the purpose of manufacturing tax losses and deductions. Although Ruffalo

masterminded the scheme (except for the Sentinel and customer trades), Lawrence cooperated in the charade. With respect to the Sentinel trade, Lawrence was well aware of Sentinel's actions in yielding the desired tax losses and deductions. To the extent these losses and deductions resulted in underpayments on Lawrence's returns, such underpayments are due to fraud and subject to the addition prescribed by section 6653(b).

Whereas Lawrence impressed us as being sophisticated in these financial transactions and was familiar with the nuances of trading in Government securities, Lonnie was not. Lonnie never finished high school. His lack of sophistication is reflected by his testimony (which we believe) that he was still uncertain what repos and reverse repos are. Lonnie relied heavily on his brother and Ruffalo. Respondent has not proven by clear and convincing evidence that Lonnie understood that these complex deals were carried out in such a way that was not bona fide, or that Lonnie understood that claiming the losses was a means of improperly avoiding tax. Therefore, we do not sustain respondent's determination with regard to the addition of tax under section 6653(b) with respect to Lonnie.

*Increased Interest*

Section 6621(c)(1) provides that, to the extent an underpayment is a "substantial underpayment attributable to tax motivated transactions," the annual rate of interest shall be 120 percent of the underpayment rate. The term "substantial underpayment attributable to tax motivated transactions" means an underpayment of income taxes that exceeds $1,000 which is attributable to one or more of the tax motivated transactions enumerated in section 6621(c)(3). The Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750, amended section 6621 to include sham or fraudulent transactions in the list of "tax motivated transactions" set forth in section 6621(c)(3). The amendment applies (1) to any underpayment with respect to which there was not a final court decision before the enactment of the act (e.g., October 22, 1986), and (2) to interest accruing after December 31, 1984. Based on our findings set forth herein, and the fact that the underpayment of tax will exceed $1,000, the

increased rate of interest provided by section 6621(c) is applicable to the underpayments due by petitioners with respect to those transactions which we found to be shams. See *DeMartino v. Commissioner*, 88 T.C. 583 (1987).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

APPENDIX A

1979 DEALER TRANSACTIONS

| Newcomb's trade transaction No. | Dealer | Type |
|---|---|---|
| 1 | Hanseatic | T-bill straddle |
| 2 | Elser | Day trade |
| 3 | CM&M | Day trade |
| 4-15 | Hanseatic | T-bill straddle |
| 16 | Hanseatic | T-bill/T-note straddle |
| 17-38 | Hanseatic | T-bill straddle |
| 39 | Elser | Cash sales |
| 40 | Hanseatic | T-bill straddle |
| 41 | Bankers | Do. |
| 42 | Hanseatic | Do. |
| 43 | Bankers | Do. |
| 44 | Hanseatic | Do. |
| 45 | Bankers | Do. |
| 46 | Hanseatic | Do. |
| 47 | Bankers | Do. |
| 48 | Hanseatic | Do. |
| 49 | Bankers | Do. |
| 50 | Hanseatic | Do. |
| 51 | Bankers | Do. |
| 52 | Hanseatic | Do. |
| 53 | Bankers | Do. |
| 54 | Hanseatic | Do. |
| 55 | Bankers | Do. |
| 56 | Hanseatic | Do. |
| 57 | Bankers | Do. |
| 58-61 | Bankers | T-bill repo-to-maturity |
| 62 | Bankers | T-bill/T-note straddle |
| 63-65 | Bankers | T-bill repo-to-maturity |
| 66 | Bradmar | T-note repo-to-maturity |

## APPENDIX B

## HANSEATIC TRANSACTIONS

| Newcomb trade transaction No. | Trade date | Transaction | Maturity date | Face amount purchased/sold (millions) | 1979 Total predetermined gain/loss | Fee to dealer | Fee to broker |
|---|---|---|---|---|---|---|---|
| 1 | 6/18/79 | Long | 3/04/80 | $20 | ($983,674) | ($4,510.61) | $4,510 |
|  |  | Short | 1/08/80 | 20 |  |  |  |
| 4 | 9/04/79 | Long | 1/03/80 | 25 | (801,848) | (14,215.73) | ¹33,561 |
|  |  | Short | 2/14/80 | 25 |  |  |  |
| 5 | 9/04/79 | Long | 2/28/80 | 40 | (1,264,033) | (4,455.00) |  |
|  |  | Short | 12/27/79 | 40 |  |  |  |
| 6 | 9/04/79 | Long | 1/08/80 | 20 | (636,084) | (6,979.00) |  |
|  |  | Short | 2/21/80 | 20 |  |  |  |
| 7 | 9/10/79 | Long | 1/10/80 | 30 | (959,282) | (20,626.38) | 11,700 |
|  |  | Short | 3/06/80 | 30 |  |  |  |
| 8 | 9/10/79 | Long | 1/03/80 | 40 | (1,283,191) | (16,349.00) | 15,134 |
|  |  | Short | 3/04/80 | 40 |  |  |  |
| 9 | 9/10/79 | Long | 1/31/80 | 35 | (1,077,733) | 17,298.00 | 14,642 |
|  |  | Short | 12/27/79 | 35 |  |  |  |
| 10 | 9/17/79 | Long | 1/08/80 | 40 | (1,219,384) | (17,114.48) | 14,533 |
|  |  | Short | 3/13/80 | 40 |  |  |  |
| 11 | 9/17/79 | Long | 1/03/80 | 35 | (1,068,075) | (16,840.00) | 12,425 |
|  |  | Short | 2/14/80 | 35 |  |  |  |
| 12 | 9/17/79 | Long | 2/05/80 | 40 | (1,170,786) | 15,895.00 | 16,133 |
|  |  | Short | 12/27/79 | 40 |  |  |  |
| 13 | 10/01/79 | Long | 1/08/80 | 45 | (1,166,071) | (15,274.15) | 14,250 |
|  |  | Short | 2/28/80 | 45 |  |  |  |
| 14 | 10/01/79 | Long | 1/10/80 | 50 | (1,290,177) | (21,704.62) | 16,000 |
|  |  | Short | 4/01/80 | 50 |  |  |  |
| 15 | 10/01/79 | Long | 1/03/80 | 55 | (1,420,453) | 16,510.21 | 16,959 |
|  |  | Short | 3/04/80 | 55 |  |  |  |
| 16 | 10/01/79 | Long | 1/03/80 | 34 | (894,818) | (6,513.72) | 5,166 |
|  |  | Short | 2/15/80 | 33 |  |  |  |
| 17 | 10/15/79 | Long | 1/03/80 | 35 | (862,776) | (16,643.26) | 9,159 |
|  |  | Short | 2/14/80 | 35 |  |  |  |

¹Total for trades Nos. 4, 5, and 6.

## APPENDIX B (cont.)

| Newcomb trade transaction No. | Trade date | Transaction | Maturity date | Face amount purchased/sold (millions) | 1979 Total predetermined gain/loss | Fee to dealer | Fee to broker |
|---|---|---|---|---|---|---|---|
| 18 | 10/16/79 | Long | 1/31/80 | $50 | ($1,179,200) | $8,155.76 | $14,917 |
|  |  | Short | 12/27/79 | 50 |  |  |  |
| 19 | 10/30/79 | Long | 1/31/80 | 45 | (943,709) | (32,968.70) | 9,450 |
|  |  | Short | 3/13/80 | 45 |  |  |  |
| 20 | 10/31/79 | Long | 3/27/80 | 70 | (1,397,895) | 19,666.33 | 14,467 |
|  |  | Short | 2/14/80 | 70 |  |  |  |
| 21 | 11/05/79 | Long | 2/21/80 | 90 | (1,172,136) | (23,178.99) | 25,650 |
|  |  | Short | 3/27/80 | 90 |  |  |  |
| 22 | 11/07/79 | Long | 3/20/80 | 75 | (1,373,405) | (8,2834.54) | 20,625 |
|  |  | Short | 4/24/80 | 75 |  |  |  |
| 23 | 11/07/79 | Long | 5/01/80 | 70 | (1,261,847) | 14,552.77 | 19,250 |
|  |  | Short | 3/27/80 | 70 |  |  |  |
| 24 | 11/07/79 | Long | 2/07/80 | 70 | (1,255,331) | (8,961.91) | 18,900 |
|  |  | Short | 3/13/80 | 70 |  |  |  |
| 25 | 11/08/79 | Long | 4/10/80 | 85 | (1,464,067) | 8,416.39 | 22,525 |
|  |  | Short | 3/06/80 | 85 |  |  |  |
| 26 | 11/13/79 | Long | 5/08/80 | 80 | (1,280,632) | (5,934.26) | 19,600 |
|  |  | Short | 4/03/80 | 80 |  |  |  |
| 27 | 11/15/79 | Long | 4/24/80 | 75 | (1,195,843) | (14,751.04) | 18,001 |
|  |  | Short | 3/20/80 | 75 |  |  |  |
| 28 | 11/15/79 | Long | 2/21/80 | 60 | (915,058) | 7,140.68 | 14,100 |
|  |  | Short | 1/17/80 | 60 |  |  |  |
| 29 | 11/16/79 | Long | 4/17/80 | 50 | (755,430) | (864.55) | 11,500 |
|  |  | Short | 3/13/80 | 50 |  |  |  |
| 30 | 11/19/79 | Long | 3/27/80 | 60 | (819,376) | 9,637.61 | 12,900 |
|  |  | Short | 4/29/80 | 60 |  |  |  |
| 31 | 11/20/79 | Long | 2/07/80 | 95 | (1,284,355) | (5,477.96) | 21,000 |
|  |  | Short | 4/30/80 | 95 |  |  |  |
| 32 | 11/21/79 | Long | 2/14/80 | 80 | (1,050,271) | 2,011.12 | 16,800 |
|  |  | Short | 3/27/80 | 80 |  |  |  |
| 33 | 11/23/79 | Long | 4/10/80 | 40 | (497,815) | (837.20) | 7,800 |
|  |  | Short | 3/06/80 | 40 |  |  |  |
| 34 | 11/26/79 | Long | 5/08/80 | 130 | (1,461,027) | (9,100.88) | 23,400 |
|  |  | Short | 4/01/80 | 130 |  |  |  |
| 35 | 11/27/79 | Long | 4/10/80 | 120 | (1,309,932) | (4,365.16) | 21,000 |
|  |  | Short | 3/04/80 | 120 |  |  |  |

## APPENDIX B (cont.)

| Newcomb trade transaction No. | Trade date | Transaction | Maturity date | Face amount purchased/sold (millions) | 1979 Total predetermined gain/loss | Fee to dealer | Fee to broker |
|---|---|---|---|---|---|---|---|
| 36 | 11/28/79 | Long | 3/14/80 | $185 | ($1,925,795) | ($2,924.44) | $31,451 |
|  |  | Short | 3/20/80 | 185 |  |  |  |
| 37 | 11/29/79 | Long | 4/03/80 | 140 | (1,440,014) | 4,411.29 | 23,100 |
|  |  | Short | 5/15/80 | 140 |  |  |  |
| 38 | 11/30/79 | Long | 3/13/80 | 150 | (1,469,563) | (5,971.19) | 24,000 |
|  |  | Short | 2/07/80 | 150 |  |  |  |
| 40 | 12/10/79 | Long | 4/17/80 | 310 | (2,118,748) | (8,476.03) | 34,100 |
|  |  | Short | 5/22/80 | 310 |  |  |  |
| 42 | 12/11/79 | Long | 5/27/80 | 305 | (1,992,616) | (4,729.03) | 32,025 |
|  |  | Short | 4/24/80 | 305 |  |  |  |
| 44 | 12/12/79 | Long | 5/01/80 | 315 | (1,939,612) | (8,278.95) | 31,499 |
|  |  | Short | 6/05/80 | 315 |  |  |  |
| 46 | 12/13/79 | Long | 5/08/80 | 320 | (1,878,451) | (3,846.80) | 30,400 |
|  |  | Short | 4/01/80 | 320 |  |  |  |
| 48 | 12/14/79 | Long | 3/04/80 | 300 | (1,639,554) | (8,823.73) | 27,000 |
|  |  | Short | 4/10/80 | 300 |  |  |  |
| 50 | 12/17/79 | Long | 3/20/80 | 325 | (1,451,063) | (2,795.15) | 24,375 |
|  |  | Short | 4/29/80 | 325 |  |  |  |
| 52 | 12/18/79 | Long | 6/12/80 | 305 | (1,287,964) | (9,649.13) | 21,350 |
|  |  | Short | 5/08/80 | 305 |  |  |  |
| 54 | 12/19/79 | Long | 3/06/80 | 280 | (1,106,899) | (7,877.50) | 18,200 |
|  |  | Short | 4/17/80 | 280 |  |  |  |
| 56 | 12/20/79 | Long | 5/15/80 | 330 | (1,188,842) | (801.70) | 19,800 |
|  |  | Short | 3/06/80 | 330 |  |  |  |
|  |  |  |  | 10,307 | (56,694,835) | (207,518.63) | 813,357 |

# APPENDIX B

## BANKERS DISCOUNT
### (all trade dates—Dec. 26, 1979)

| Newcomb trade transaction No. | Transaction | Maturity date | Face amount purchased/sold (millions) | 1979 Total predetermined gain/loss | Fee to dealer | Fee to broker |
|---|---|---|---|---|---|---|
| 41 | Long | 4/17/80 | $310 | ($2,118,858) | ($8,597.58) | $34,100 |
| | Short | 5/22/80 | 310 | | | |
| 43 | Long | 5/27/80 | 305 | (1,992,758) | (4,884.57) | 32,025 |
| | Short | 4/24/80 | 305 | | | |
| 45 | Long | 5/01/80 | 315 | (1,939,716) | (8,398.61) | 31,499 |
| | Short | 6/05/80 | 315 | | | |
| 47 | Long | 5/08/80 | 320 | (1,878,544) | (3,951.56) | 30,400 |
| | Short | 4/01/80 | 320 | | | |
| 49 | Long | 3/04/80 | 300 | (1,639,609) | (8,886.95) | 27,000 |
| | Short | 4/10/80 | 300 | | | |
| 51 | Long | 3/20/80 | 325 | (1,451,190) | (2,941.81) | 24,375 |
| | Short | 4/29/80 | 325 | | | |
| 53 | Long | 6/12/80 | 305 | (1,288,028) | (9,723.24) | 21,350 |
| | Short | 5/08/80 | 305 | | | |
| 55 | Long | 3/06/80 | 280 | (1,106,917) | (7,897.74) | 18,200 |
| | Short | 4/17/80 | 280 | | | |
| 57 | Long | 5/15/80 | 330 | (1,188,888) | (869.33) | 19,800 |
| | Short | 3/06/80 | 330 | | | |
| | | | 5,580 | (14,604,508) | (56,157.39) | 238,749 |