SHAUNA E. SORENSEN, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RICHARD L. BERNACCHI, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sorensen v. Commissioner
Docket Nos. 12264-83, 16886-83
United States Tax Court
T.C. Memo 1994-175; 1994 Tax Ct. Memo LEXIS 171; 67 T.C.M. (CCH) 2721; T.C.M. (RIA) 94175; April 19, 1994, Filed *171 Decision will be entered under Rule 155. For petitioner in docket No. 12264-83: Bruce I. Hochman, William M. Weintraub, Charles P. Rettig, and Joanna J. Tulio. For petitioner in docket No. 16886-83: John C. Fossum and Milton B. Hyman. For respondent: Christine Barish and Mary Schewatz. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1979 in the amount of $ 196,182 and an addition to tax under section 6653(a) in the amount of $ 9,809. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. These cases were consolidated for purposes of trial, briefing, and opinion. After concessions, the sole issue for decision is whether petitioner Shauna E. Sorensen is entitled to "innocent spouse" relief under section 6013(e) with respect to the substantial understatement resulting from transactions involving First Western Government Securities (First Western) reflected on petitioners' 1979 joint income tax return. Petitioner Richard L. Bernacchi *172 has settled all issues with respect to his case. We hold that petitioner Shauna E. Sorensen is not entitled to relief as an innocent spouse. When discussed individually we will refer to petitioner Shauna E. Sorensen as petitioner, and petitioner Richard L. Bernacchi as Bernacchi. Shauna E. Sorensen and Richard L. Bernacchi together will be referred to as petitioners. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners filed separate petitions. Petitioner was separated from Bernacchi and resided in Los Angeles, California, at the time her petition was filed. Bernacchi resided in Marina del Ray, California, at the time his petition was filed. Petitioner recevied a B.A. degree from the University of Southern California in 1962. She majored in education and Spanish. At the time of graduation, petitioner was inducted into the Phi Beta Kappa honors society. She also was presented with the Order of the Laurel, awarded to the outstanding female graduate of the year. Petitioner received a Fulbright-Hays scholarship, a financial award granted to a promising graduate student with high academic credentials. In addition, during *173 the years 1962 to 1964, petitioner was awarded two National Defense Graduate Fellowships, which helped to finance her graduate education. In 1964, petitioner received an M.A. from the University of Southern California in Latin-American studies. Petitioners were married on October 30, 1964. From July 1965 through October 1966, while Bernacchi was stationed in Okinawa with the Army, petitioner was employed as a supervisor of a United States Army Special Services branch library on Okinawa. Also in 1965, petitioner taught Spanish for a semester in a program run by the University of Maryland. In 1967, after the couple had returned to California, petitioner worked for 2 to 3 months as a technical writer for ITT Canon Electric. She then moved to a job at McDonnell Douglas Corporation as a technical writer, receiving approximately $ 1,500 per month in compensation. She remained at this job for just over a year, leaving shortly before the couple's daughter was born in 1968. Petitioner resumed working full time in 1973, when she was employed as the editor-in-chief of Ward Ritchie Press, a local publishing house. While at Ward Ritchie Press, petitioner was in charge of developing ideas *174 for books, reading manuscripts, negotiating contracts between authors and agents, and supervising copyeditors, proof-readers, and the production editor. She remained with Ward Ritchie Press as editor-in-chief for approximately 2 years, receiving between $ 15,000 and $ 18,000 each year. From 1971 to 1980, petitioner also worked as a freelance editor and writer. During this period, she provided editorial services and wrote several articles for Architectural Digest. In addition, she wrote stories, screenplays, and was involved in various creative writing projects. Petitioner took several trips in connection with her freelance writing activities. Although the trips typically mixed business and pleasure, petitioner kept receipts and recorded some of her business-related expenses so that her business expenses could be deducted. Petitioners filed a Schedule C with their Federal and State returns for petitioner's business activities for each of the years 1971-1980. On each Schedule C, petitioners claimed deductions for various business expenses related to petitioner's freelance writing and editing activities, including costs associated with the use of a portion of petitioners' personal *175 residence as a home office. Bernacchi graduated first in his class from the University of Santa Clara with a major in business and accounting. Thereafter, he attended law school at the University of Southern California Law Center where he served as editor-in-chief of the law review and was inducted into the Order of the Coif. He graduated first in his class in 1964 and, later that year, joined the law firm of Irell & Manella in Los Angeles as an associate. Bernacchi became a partner in 1970. He initially practiced primarily in the area of corporate law, but beginning about 1968 developed a specialty in computer law. In 1977, petitioners bought a large house on North Bristol Avenue in Brentwood, California (the Bristol house), for $ 390,000. In late 1978, Bernacchi agreed to open the Irell & Manella office in Newport Beach (Orange County), California. Petitioners decided that they should sell the Bristol house and that the kitchen should be substantially renovated in order to maximize the house's potential value. Petitioner oversaw the renovations and kept track of expenses so that they could be added to petitioners' basis in the house. In July 1979, petitioners sold the *176 Bristol house for $ 1 million. Upon moving to Orange County, petitioners rented a 3-bedroom residence in Laguna Beach. While Bernacchi was pleased with the move, petitioner was unhappy and wanted to return to Los Angeles. Consequently, in August 1980, petitioners returned to Los Angeles, buying a house on Weyburn Avenue in Los Angeles, California, for $ 735,000. Throughout their marriage petitioners led a very comfortable lifestyle. Financial statements prepared in the late 1970s list the couple's net worth at over $ 1 million. They traveled frequently, entertained both at home and at restaurants, and sent their daughter to a private school for many years. In addition, petitioners made several real estate investments. In July 1973, petitioners bought an 8-unit apartment building located at 11921 Goshen Avenue in Los Angeles (the Goshen building) for investment purposes. In November 1975, petitioners bought a cabin at Big Bear Lake, California. In January 1980, petitioners bought a shopping center in Mission Viejo, California, for $ 850,000. Petitioner was involved in decisions regarding the couple's real estate investments and was aware of the tax advantages of making these *177 investments. Petitioner did much of the hunting to find both the Goshen building and the Mission Viejo shopping center, and managed some aspects of the Goshen building for approximately 1 year after the purchase. Bernacchi dealt with most of the legal aspects of the purchases. In addition to the real estate investments, Bernacchi made investments through his firm that were recommended or sponsored by other partners. The funds used for these investments came either from one of petitioners' joint accounts or directly from Bernacchi's draw at Irell & Manella. Petitioner was aware that Bernacchi participated in these investments, but Bernacchi typically did not discuss individual investments made through Irell & Manella with petitioner because they were made fairly frequently and most involved relatively small amounts of money. On a few occasions, petitioner recommended investments to Bernacchi. In one instance, a friend of petitioner's told her about a tax-oriented real estate partnership investment called Systech Pacific Properties. Petitioners attended an information session about the investment at the friend's home and then invested in the partnership. On another occasion, *178 they bought stock in Twentieth Century Fox based on petitioner's suggestion. In addition, based on research that she performed and her sister's suggestion, petitioner recommended that they buy gold Krugerands. Despite the fact that Bernacchi had some concerns about this investment, petitioners invested approximately $ 35,000 in gold Krugerands in 1980. Faced with a particularly large tax liability for 1979, Bernacchi began to investigate investing in various tax shelters. He learned from a friend about First Western. In 1978, First Western began marketing portfolios of forward contracts for securities of the Government National Mortgage Association and the Federal Home Loan Mortgage Corporation. After Bernacchi received First Western's offering circular and various other informational materials, he spoke with Harv H. Mossawir, Jr. (Mossawir), a partner at Irell & Manella, who specialized in tax. Mossawir reviewed the materials and informed Bernacchi that he thought the investment would be fairly risky. Mossawir stated that petitioners should view the transaction "as a loan from the U.S. Government". Petitioner was not present during Bernacchi's conversation with Mossawir, *179 but Bernacchi mentioned the First Western investment to petitioner and asked her whether she had any objection to making the investment. In November 1979, despite Mossawir's concerns about the investment, Bernacchi invested $ 20,000 from petitioners' joint checking account in First Western. The investment account was listed in Bernacchi's name. While petitioners were living in Orange County, First Western statements and correspondence were sent both to their home and to Bernacchi's office. When petitioners moved back to Los Angeles, statements and correspondence were sent to Bernacchi's office. In addition to the First Western investment and the purchase of the Mission Viejo shopping center, petitioners made several purchases following the sale of the Bristol house. In September 1979, petitioners purchased a Porsche automobile for $ 17,040, of which $ 8,000 was financed. In January 1980, petitioners bought a Mercedes for $ 22,579, financing $ 17,679 of that amount. In February 1980, petitioners bought a 3.79 carat diamond for $ 37,736, which petitioner had set into a ring. Petitioners were generally open with each other about finances. They discussed the family's financial *180 affairs fairly often. Petitioner was free to spend community funds as she wished, although typically she discussed with Bernacchi large purchases that she intended to make, for example for antiques or art. Petitioner had credit cards both in petitioners' joint names and in her own name. Petitioners had several joint checking accounts but primarily used one account into which they deposited their salaries and for which they both had checkbooks. They maintained some separate accounts for estate planning purposes, for the Goshen building, and for the Mission Viejo shopping center. Because of the couple's frequent moves, Bernacchi arranged for most bank statements and other financial documents to be sent to his office. His secretary at Irell & Manella maintained the couple's personal records. Whenever the couple obtained a loan, Bernacchi prepared a financial statement for the bank and gave copies to petitioner. Petitioner and Bernacchi filed a joint return for 1979. The return was prepared by Donald Hochman, petitioners' accountant, based on information sent to him by Bernacchi. Hochman did not meet with petitioner or Bernacchi regarding the preparation of the return or the *181 information contained therein. The return reflects $ 129,545 of total income, after deducting an ordinary loss of $ 144,181 from the First Western investment, a tax of $ 11,586, and estimated tax payments of $ 40,800, resulting in an overpayment of $ 29,214. In 1978, petitioners filed a joint return, reporting $ 174,856 of total income, after deducting a $ 47 ordinary loss, a tax of $ 40,659, and estimated tax payments of $ 40,000, resulting in $ 819 of tax owed. Petitioners separated in April 1981. Petitioner filed a petition for dissolution of the marriage in May or June of 1981 and the judgment of dissolution became final on June 7, 1983. In 1981, petitioner met with Charles Wiese (Wiese), an accountant, to get financial and tax advice pursuant to the dissolution of the marriage. While Wiese and petitioner were reviewing a list of community assets, Wiese questioned petitioner about the First Western investment. Petitioner recognized the name but was unable to provide Wiese with any information about the investment. Respondent issued a statutory notice of deficiency disallowing losses claimed from the First Western investment. Subsequently, in Freytag v. Commissioner, 89 T.C. 849, 887 (1987), *182 affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S. Ct. 2631 (1991), this Court held that transactions involving First Western were "illusory and fictitious, i.e., shams." Petitioners have conceded that they were not entitled to claim a deduction for losses resulting from the First Western investment. Petitioners have stipulated that the correct deficiency determination for each case is $ 77,076 and that each is liable for an addition to tax pursuant to section 6653(a), subject to this Court's resolution of the innocent spouse issue. OPINION Spouses filing a joint tax return are jointly and severally liable for the tax arising therefrom. Sec. 6013(d)(3). Petitioner, however, argues that she should be relieved of her tax liability for the year at issue since she was an innocent spouse within the meaning of section 6013(e). In order to invoke the protection of section 6013(e), petitioner must show that: (1) A joint return was filed for the year at issue (sec. 6013(e)(1)(A); (2) there was a substantial understatement of tax attributable to grossly erroneous items of the other spouse on the return (secs. 6013(e)(1)(B), *183 (e)(2) and (3)); (3) the innocent spouse, in signing the return, did not know or have reason to know of the substantial understatement (sec. 6013(e)(1)(C)); and (4) under all the facts and circumstances, it would be inequitable to hold the innocent spouse liable for the deficiency and tax resulting from the substantial understatement (sec. 6013(e)(1)(D)). Petitioner has the burden of proving each requirement of section 6013(e). Rule 142(a); Russo v. Commissioner, 98 T.C. 28, 31-32 (1992). A failure to prove any one of the requirements will preclude the spouse from relief. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Respondent concedes that petitioners filed a joint return for the year in issue and that the return contains a substantial understatement of tax attributable to grossly erroneous items. Respondent, however, contends that petitioner has failed to prove that no part of the grossly erroneous items *184 was attributable to her. Respondent also contends that petitioner knew or had reason to know of the substantial understatement. Finally, respondent argues that petitioner has not shown that it would be inequitable to hold her liable for the deficiency and addition to tax. 1. Section 6013(e)(1)(B): Attribution
Section 6013(e) requires that the substantial understatement of tax, with respect to which the alleged innocent spouse can be relieved of liability, must be attributable to grossly erroneous items of the other spouse. Respondent contends that petitioner does not qualify for innocent spouse status because the items in issue are not solely items "of" Bernacchi. Stating that, "In cases involving tax shelters, relief is not appropriate in instances where the spouse seeking such relief personally invested in the tax shelter." Respondent argues that the claimed deduction is attributable to petitioner as well as to Bernacchi. We do not agree. Petitioner did not execute any of the documents pertaining to the investment; the account was listed in Bernacchi's name alone; most of the statements and documents relating to the First Western investment were sent to Bernacchi's *185 office; and Bernacchi executed the check for the original investment from the couple's joint account. Without addressing the issue of how much petitioner may have known about the First Western investment at the time it was made, from the evidence submitted, it appears that petitioner had little, if any, direct contact with First Western. Under these circumstances, we conclude that the deduction was attributable solely to Bernacchi. On brief, respondent notes that community property funds were used for the First Western investment. However, we have previously dismissed the theory that California's community property laws cause a claimed loss to be attributed to a spouse seeking the protection of section 6013. Bouskos v. Commissioner, T.C. Memo. 1987-574. In Bouskos, we stated: Although California is a community property state, in this case no actual loss was produced to be shared by * * * [the alleged innocent spouse] under California community property laws. The transaction that purportedly generated the alleged loss had no legal basis; it is well settled that such transactions do not create actual losses. Price v. Commissioner, 88 T.C. 860, 883-885 (1987); *186 Glass v. Commissioner, 87 T.C. 1087, 1177 (1986). We therefore conclude that California community property laws do not attribute any of the nonexistent loss to * * * [the alleged innocent spouse] * * * [Id.; citation omitted.]
The instant cases also involved transactions that had no legal basis and thus created no actual losses. Consequently, California community property laws do not attribute any of the nonexistent loss to petitioner. 2. Section 6013(e)(1)(C): Knowledge
Section 6013(e)(1)(C) provides that the alleged innocent spouse must establish that, in signing the return, he or she did not know, and did not have reason to know, that the return contained a substantial understatement of tax. Petitioners contradict each other on the issue of petitioner's familiarity with the details of the First Western investment. At trial, petitioner testified that she was told nothing at all about the First Western investment. She stated that she signed the return but did not see the deduction relating to the First Western investment. Bernacchi maintained that she was well informed of the risks and the tax consequences of the transaction. *187 Given the other evidence about the manner in which petitioners made decisions regarding substantial joint investments, we are not convinced that petitioner did not have actual knowledge of the substantial understatement. However, aside from any actual knowledge petitioner may have possessed, she has failed to prove that she did not have "reason to know" of the substantial understatement. For purposes of the knowledge test, the Court of Appeals for the Ninth Circuit, to which this case would be appealed, differentiates between cases involving income omission and those involving deductions: literal superimposition of the legal standard developed in omission cases onto deduction cases * * * would for the most part wipe out innocent spouse protection in the latter category. * * * because deductions are necessarily recorded, any spouse who at least reads the joint return will be put on notice that some transaction allegedly has occurred to give rise to the deduction. * * * [Price v. Commissioner, 887 F.2d 959, 963 n.9 (9th Cir. 1989), revg. an Oral Opinion of this Court.]
Thus, petitioner's knowledge of the transaction underlying the erroneous *188 deduction is relevant, but that knowledge alone does not preclude relief. According to the Court of Appeals for the Ninth Circuit, a spouse will be held to have known or to have had reason to have known that there was a substantial understatement in tax on the joint tax return if a reasonable person in her position, with her level of intelligence, would have thought there was such a substantial understatement. Price v. Commissioner, 887 F.2d at 965. Factors to consider in analyzing whether the alleged innocent spouse had "reason to know" of the substantial understatement include: (1) The spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. Id.
With respect to petitioner's level of education, she was a well-educated and extremely bright woman. She had a masters degree and had done very well in school. While she had not received any formal education *189 specifically in taxation or accounting, there is no question that she was capable of understanding the consequences of the investment in First Western and that she had gained some practical tax experience over the years. She handled a variety of duties as editor-in-chief of Ward Ritchie Press, including negotiating contracts between authors and agents. During the years that she worked as a freelance writer and editor, she kept track of her business expenses so as to be able to deduct them on petitioners' income tax returns. In addition, evidence demonstrated that petitioner was aware of the tax advantages of investing in real estate. With respect to petitioner's involvement in the family's business and financial affairs, she played an active role in the family's finances. While most of petitioners' financial records were kept at Bernacchi's office, this appears to have been done for convenience, as his secretary kept track of the couple's personal records, and not from a desire to exclude petitioner from involvement in financial and business matters. Furthermore, petitioners discussed finances fairly regularly, and petitioner saw copies of their financial statements whenever *190 the couple obtained a loan. She had access to the couple's joint accounts and was not required to adhere to an allowance. For periods in the marriage she earned a salary. She sometimes paid bills and kept track of various expenses. While the evidence suggests that Bernacchi took the lead in making most investment decisions, petitioner does not appear to have been an unknowing participant in the majority of their investments. She was actively involved in the decisions to purchase both the Goshen building and Mission Viejo shopping center, and in fact managed the Goshen building for a period of time after its purchase. In addition, on at least three occasions, petitioners made investments based on her recommendation. In applying the third factor, we note that evaluating the presence of expenditures that seem unusual or lavish when compared to the family's past levels of income may not provide much guidance in the instant cases. Petitioners were quite wealthy apart from any amounts generated by the losses claimed from the First Western investment and had a substantial amount of cash available after the sale of the Bristol house. Petitioners made several large purchases after *191 the investment in First Western, but it would be difficult to conclude that any of these expenditures were the direct result of the tax savings generated by the First Western losses and would not have been made otherwise. on the other hand, the fact that petitioners made several large purchases and their affluent lifestyle remained basically unaffected, despite having claimed a deduction that substantially reduced their income, might be seen as suspicious. See Stevens v. Commissioner, 872 F.2d 1499, 1506 (11th Cir. 1989). With respect to the fourth factor, petitioner presented no evidence that Bernacchi acted in an evasive or deceitful manner or that he misled her in any way concerning the couple's finances or the filing of their 1979 return. In sum, petitioner's involvement in the family's financial affairs, her general understanding of the tax consequences of some investments, and her level of education, should have given petitioner reason to know that the joint income tax return contained a substantial understatement of tax liability attributable to the First Western deduction. We note that the Court of Appeals for the Ninth Circuit has held, *192 that even in situations where a spouse is not aware of sufficient facts to give her a reason to know of the substantial understatement, she nevertheless may know enough facts to put her on notice that such an understatement exists. Price v. Commissioner, 887 F.2d at 965. The test for determining whether the spouse was on notice of the understatement is the same subjective test used to determine whether she had reason to know of the understatement: would a reasonably prudent taxpayer in her position be led to question the legitimacy of the deduction. Guth v. Commissioner, 897 F.2d 441, 445 (9th Cir. 1990), affg. T.C. Memo. 1987-522. If the spouse is aware of sufficient facts to put her on notice of an understatement, "a duty of inquiry arises, which, if not satisfied by the spouse, may result in constructive knowledge of the understatement being imputed to her." Price v. Commissioner, 887 F.2d at 965. In 1979, the loss from the First Western investment substantially reduced petitioners' total income. Their tax computations resulted in the recovery of $ 29,214 *193 of the $ 40,800 previously paid as estimated tax. The Court of Appeals for the Ninth Circuit, as well as other Courts of Appeals, have noted that tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing or eliminating the taxpayers' tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability. Hayman v. Commissioner, 992 F.2d 1256, 1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Price v. Commissioner, 887 F.2d at 965-66; Stevens v. Commissioner, 872 F.2d at 1507. In Price, the taxpayers claimed a $ 90,000 deduction and reported $ 100,000 of total income. Price v. Commissioner, supra at 966. The Court of Appeals for the Ninth Circuit noted that the relative size of the deduction, when considered in light of the fact that the alleged innocent spouse knew of the investment giving rise to the deduction, was enough to put that spouse on notice. Id. The Court of Appeals concluded, however, that given her *194 relative lack of experience in and understanding of financial affairs, the spouse satisfied her duty of inquiry by questioning her husband about the deduction. Id.
These cases are distinguishable from Price. Petitioner ignored the First Western deduction, made no inquiries, and signed the return, despite the comparatively large size of the deduction and the fact that she was aware of the First Western investment. Given petitioner's relative sophistication regarding financial affairs, we conclude that petitioner failed to satisfy her duty of inquiry. 3. Section 6013(e)(1)(D): Equities
Having reached the above conclusion, we need not dwell on the question of whether it would be inequitable to hold petitioner liable for the deficiencies. There is no evidence to indicate that petitioner did not share in the tax benefits resulting from the First Western deduction. Petitioner has not carried her burden of proof to show that it would be inequitable to hold her liable for the tax on the joint return. Decisions will be entered under Rule 155.