JOHN M. MONAHAN AND RITA K. MONAHAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Monahan v. Commissioner
Docket No. 14677-91
United States Tax Court
T.C. Memo 1994-201; 1994 Tax Ct. Memo LEXIS 203; 67 T.C.M. (CCH) 2900; T.C.M. (RIA) 94201; May 5, 1994, Filed *203 Decision will be entered under Rule 155. For petitioners: F. Michael Kovach, For respondent: Christopher D. Hatfield
RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661 1984
$ 201,640
$ 10,082
50% of the
$ 50,410
interest due
on $ 201,640
1985
74,082
3,704
50% of the
18,521
interest due
on $74,082
Additional Interest Year
Sec. 6621(c)
1984
Int. apr. 120%
of IRC 6621(a)
rateon $ 201,640
1985
Int. apr. 120%
of IRC 6621(a)
rateon $74,082
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661 1986
$ 10,964
$ 548
50% of the
$ 2,741
interest due
on $ 10,964
1987
12,673
634
50% of the
3,168
interest due
on $ 12,673
1988
$ 1,834
$ 92
N/A
N/A
Additional Interest Year
Sec. 6621(c)
1986
Int. apr. 120%
of IRC 6621(a)
rate on $ 10,964
1987
Int. apr. 120%
of IRC 6621(a)
rate on $ 12,673
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661 1988
$ 1,834
$ 92
N/A
N/A
*204 Additional Interest Year
Sec. 6621(c)
1988
Int. apr. 120%
of IRC 6621(a)
rate on $ 1,834
The issues for decision are: (1) Whether the notice of deficiency was timely regarding taxable year 1984; (2) whether and when petitioners realized income due to the termination of an interest in a partnership held by John M. Monahan (hereinafter petitioner); (3) whether petitioners were entitled to losses for payments to the former partnership in 1984 and 1985; (4) whether petitioners failed to report interest income earned during 1985 on certificates of deposit; (5) whether payments made to certain entities in 1987 and 1988 were deductible as interest; (6) whether petitioners are liable for additions to tax as determined by respondent; and (7) whether petitioners are entitled to use income averaging in determining their income for 1986. [1]
*205 Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Seattle, Washington, when they filed their petition. For purposes of convenience, our findings of fact and opinion for each issue are combined. The major issues revolve around Span Services Co. (Span Services), an Anguillan general partnership cofounded by petitioner on September 1, 1981. The other partners in Span Services were: (1) Edwards Interests, Ltd. (Edwards Interests), a Washington corporation holding a 51-percent partnership interest and wholly owned by Robert T. Edwards, a Canadian citizen; and (2) Span Corp., Ltd. (Span Corp.), an Anguillan corporation holding a 4-percent partnership interest and wholly owned by Lynwood S. Bell, a Canadian citizen residing in Anguilla. The Span Services partnership agreement allocated 100 percent of partnership gross income to Span Corp. Petitioner was allocated 45 percent of partnership losses and deductions. Petitioner is a lawyer specializing in corporate and international trade law with emphasis in tax planning and complex corporate transactions. [2] Most of *206 the entities involved herein were directly or indirectly owned -- either jointly or separately -- by petitioner and Mr. Bell, who had a close business relationship. Both Mr. Bell and petitioner had financial and business reasons for continuing their close relationship. Petitioner recommended Mr. Bell to his clients for business dealings and introduced clients to Mr. Bell. Some of petitioner's clients paid management fees to entities owned by Mr. Bell. From 1981 through 1988, petitioner acted as tax counsel for Span Corp.
1. Timeliness of Notice of Deficiency for 1984
Section 6501(a) [3] generally provides that the amount of any tax imposed by the Internal Revenue Code shall be assessed within *207 3 years after the return is filed. Section 6501(e)(1)(A) extends the time to assess tax: In the case of any tax imposed by subtitle A -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *
Thus, when the circumstances mentioned in section 6501(e)(1)(A) are present, it creates a 6-year period of limitations during which the Commissioner may assess tax. See Thoburn v. Commissioner, 95 T.C. 132, 146 (1990). Following the mandate of the Supreme Court, we must construe statutes of limitation strictly *208 "in favor of the Government." Badaracco v. Commissioner, 464 U.S. 386, 391-392 (1984); Thoburn v. Commissioner, supra at 146-147. The notice of deficiency in this case was dated April 5, 1991. Petitioners' 1984 return was signed on April 14, 1985. It is therefore deemed filed no earlier than April 15, 1985, Thoburn v. Commissioner, supra at 146, which is within 6 years of the date the notice of deficiency was issued. The additional 1984 income determined by respondent exceeds $ 400,000. It is undisputed that this is clearly greater than 25 percent of the amount of gross income reported on petitioners' 1984 return. See sec. 6501(e)(1)(A). Thus, if we find that petitioners omitted the income in question and that the omission was from petitioners' 1984 gross income, then the 6-year period of limitations will apply to petitioners' 1984 taxable year. Sec. 6501(e)(1)(A). Respondent bears the burden of proving that petitioners omitted the income in question in 1984. Estate of Dillingham v. Commissioner, 903 F.2d 760, 765 (10th Cir. 1990), affg. 88 T.C. 1569 (1987).
*209 2. Omitted Income from Petitioner's Termination and Transfer of Interest in Span Services a. Timing of Termination
Respondent contends that petitioner terminated his interest in Span Services during 1984 and that petitioner realized $ 400,074 in income from that transaction. Petitioners argue that petitioner terminated his interest in 1983. Span Services did not carry on a trade or business in the United States, nor did it have United States sourced income during the taxable years 1981 through 1984. [4] On December 31, 1983, Span Services had liabilities of $ 2,210,043, petitioner's allocable share of partnership liabilities totaled $ 994,519, and his capital account was in deficit by $ 400,074. Because of his potential liability for partnership debts and because of disagreements between the partners, petitioner began to *210 consider terminating his interest in Span Services. Upon hearing of petitioner's intention to terminate his interest in Span Services, petitioner's accountant, Michael J. Maloney, advised him to terminate his interest at the end of a taxable year to minimize accounting difficulties. Mr. Maloney could not recall at trial when that discussion took place. Sometime after October 12, 1984, petitioner executed an undated "Termination and Transfer Agreement" by which he agreed to sell his interest in Span Services to Edwards Holdings, Ltd. (Edwards Holdings), an Anguilla corporation, in return for the agreement of Edwards Holdings to assume petitioner's allocable share of Span Services' liabilities. The agreement stated, in pertinent part: 1. Effective as of January 1, 1984, Edwards Holdings Limited agrees to buy, and John M. Monahan agrees to sell, * * * [his] 45 percent capital and profits interest in Span Services Co. in consideration of Edwards Holdings Limited assuming John M. Monahan's pro rata share of the liabilities of Span Services Co. * * * 3. Pursuant to paragraph 6.3 of the Partnership Agreement, John M. Monahan agrees to restore his negative capital account arising *211 due to the operations of Span Services Co. in the amount of $ 400,074.00. It is agreed by the parties that this amount will fully restore such amount to the partnership as is necessary to result in his capital account equalling zero. 4. John M. Monahan further agrees to pay the delinquent management fee owing to Span Corp Limited in the amount of $ 170,000.00. It is agreed by the parties that this expense is to be borne individually by John M. Monahan, but that should such expense be attributed to the partnership, that it shall be specially allocated to John M. Monahan, and that this expense is required to be paid to complete the termination of his interest in the partnership. 5. Attached to this Termination and Transfer Agreement, and hereby incorporated by reference, are financial statements for Span Services Co., and the Schedule K-1, as filed by the partnership for John M. Monahan showing the amount of his negative capital account. 6. By the terms of this Agreement, John M. Monahan hereby assigns his interest in the partnership in favor of Edwards Holdings Limited effective as of January 1, 1984, and, accordingly, agrees that any income or loss of the partnership on and *212 after that date will accrue to the benefit of Edwards Holdings Limited.
The language of the termination agreement supports respondent's position. It states that "Effective as of January 1, 1984, Edwards Holdings Limitedagrees to buy, and John M. Monahan agrees to sell". In that sentence, the parties agree to buy and sell effective as of a specified date. That date is January 1, 1984, not December 31, 1983. Thus, on December 31, 1983, the agreement, by its literal terms, was not effective. [5]
There is no question that the written agreement was executed after October 12, 1984, since it incorporates petitioner's Schedule K-1 "as filed" for 1984. That schedule was not signed by petitioner until that date and could not have been filed until sometime thereafter. Petitioners argue, however, that petitioner had made an unwritten *213 contract prior to December 31, 1983, in which the parties agreed that petitioner's interest in Span Services would terminate on that date. While a valid contract may exist prior to its reduction to written form, Bharat Overseas, Ltd. v. Dulien Steel Products, Inc., 321 P.2d 266, 268 (Wash. 1958); Stottlemyre v. Reed, 665 P.2d 1383, 1385 (Wash. Ct. App. 1983), the only evidence offered by petitioners to show the existence of a prior unwritten agreement was their own testimony. However, neither of the Monahans could point to specific dates or even months. We find their testimony self-serving and unconvincing, especially in light of previous contradictory testimony given under oath by Mr. Monahan. [6]
*214 The documentary evidence overwhelmingly supports respondent's position. Petitioners' Statement of Estimated Financial Condition, December 31, 1983, stated that petitioner owned 45 percent of Span Services, and that he had a negative "tax basis" of $ 400,074. Petitioners' 1983 U.S. Individual Income Tax Return (Form 1040) contains no statement or indication that petitioner sold his Span Services partnership interest during 1983. Span Services filed a U.S. Partnership Return of Income (Form 1065) for taxable year 1983. There is no indication in the 1983 partnership return or in the attached Schedules K-1 that petitioner terminated his interest in that year. Indeed, the Schedules K-1 "End of year" numbers for each partner's percentage of profit sharing, loss sharing, and capital ownership are no different from those listed in the partnership agreement. A column is provided on those schedules for percentage interests "Before decrease or termination". This column is left blank on each partner's schedule. We infer from this that no change occurred during the year. Petitioners' 1984 and 1985 Federal income tax returns claimed Schedule E losses naming Span Services as the partnership *215 from which the losses were passed through. Finally, we note that petitioner signed the partnership's return as a partner on October 12, 1984. He was the only partner to sign the partnership return. [7]
Given the weight of the documentary evidence in favor of respondent's position, we find that the termination occurred during 1984. b. Income from Termination
The Span Services Termination *216 and Transfer Agreement indemnifies and * * * holds [petitioner] harmless from any and all liabilities in Span Services Co. as may arise from past or future claims." Petitioner's share of partnership liabilities prior to the Agreement was $ 994,519. Petitioner's basis in his partnership interest at this time was $ 594,445. [8] Respondent contends that petitioner sold his Span Services partnership interest via the Termination and Transfer Agreement and must recognize income of $ 400,074, which is equal to the excess of his share of liabilities over his basis. See secs. 752(d), 1001(a); Crane v. Commissioner, 331 U.S. 1 (1947). The Termination and Transfer Agreement constituted a sale of petitioner's interest in Span Services. Paragraph 1 states this clearly: "Effective as of January 1, 1984, Edwards Holdings Limited agrees to buy, and John M. Monahan agrees to sell, Transferor's 45 percent capital and profits interest in Span Services Co.". Thus, petitioners must recognize gain or loss on this sale as they would upon the sale of any other capital asset. Sec. 741. Petitioners did not report any gain or loss from the sale of petitioner's Span Services *217 partnership interest. *218 c. Repayment of Deficit Capital Account
The Termination and Transfer Agreement specifically notes that petitioner had a "negative capital account" of $ 400,074 at the time of transfer and that petitioner was to repay that amount to the partnership. Petitioners contend that petitioner did repay this amount and that they should not have to recognize income as a result of the termination. Respondent counters that petitioner's repayment was a sham, that petitioner retained control and dominion over all funds allegedly used for repayment, [9] and that we should disregard the purported repayment for purposes of determining petitioner's income from the termination. We agree with respondent. *219 The facts surrounding petitioner's purported repayment of his negative capital account are complex and involve several entities. Around the time petitioner was considering whether to terminate his interest in Span Services, he began discussions with Mr. Bell regarding alternative options for petitioner's and Span Corp.'s investments in Span Services. Petitioner also devised a comprehensive personal financial plan around this time. One part of this plan was the creation of a vehicle through which petitioner could protect part of his assets from creditors to the greatest extent possible. Pursuant to this plan and petitioner's discussions with Mr. Bell, Span Corp. incorporated a wholly-owned subsidiary in Anguilla called Grove Management, Ltd. (GML) on February 24, 1984. Petitioner had no formal ownership interest in GML, but entered a consulting agreement with GML and, as compensation for his services to be performed, was granted stock appreciation rights (SAR's) over 2,581 of GML's 2,637 issued and outstanding common voting shares. The SAR's entitled their holder to receive any appreciation inherent in an issued and outstanding share of GML common stock on the date of exercise. *220 GML required written notice prior to exercise, and exercise was not permitted before July 1, 1987. However, petitioner could exercise the SAR's at any time simply by terminating the consulting agreement, a possibility which was unrestricted. Petitioner believed that the SAR's were relatively secure from potential creditors because they were contractual in nature, were derived from a foreign entity, and were not owned directly by him. In March 1984, petitioner transferred to GML a $ 25,000 annuity previously held for him by Edwards Holdings. The value of the SAR's was increased by income earned by, and capital contributed to, GML. GML maintained the number of voting common shares at 2,637 at least through June 27, 1987. No shareholder of GML could transfer or encumber its shares without the written consent of a majority of company directors and a majority of the holders of any issued, outstanding, and unexercised SAR's. Petitioner's consulting agreement with GML required him to manage GML's investments and to provide investment advice. In order to effectuate this agreement, petitioner and GML became partners in a general partnership called Aldergrove Investments Co. (Aldergrove), *221 formed July 1, 1984. GML was thereby able to transfer assets to Aldergrove for management by petitioner without compromising petitioner's dissociation from GML for purposes of his asset protection plan. Petitioner utilized GML and Aldergrove to "repay" his deficit capital account in Span Services. In making such repayment, petitioner "wanted to maintain the option to receive the funds back through the stock appreciation rights plan" and wished to retain the ability to "receive that income back in the future." Petitioner approached Rainier National Bank (Rainier) regarding a loan of $ 400,000 to be used to restore his deficit capital account. After negotiations, Rainier and petitioner agreed that the loan would be a joint obligation by petitioner and Aldergrove and that all funds paid to Span Services upon termination of petitioner's interest would ultimately find their way to Aldergrove. In consideration for Aldergrove's agreement to serve as joint obligor, petitioner agreed to pay Aldergrove an $ 8,000 fee. Petitioner does not recall paying that fee. The actual "repayment" of petitioner's deficit capital account to Span Services took place on December 27, 1984. In a series *222 of preplanned transfers, the $ 400,000 loan was transferred to petitioner's account at Rainier. Petitioner immediately issued a check for $ 400,074, which was deposited into a Span Services account. That amount was then transferred to a Span Corp. account, then to a GML account, and then to an Aldergrove account. GML's capitalization came from the funds it received in this series of transfers (and future transfers described infra). On the same day, Aldergrove invested $ 400,074 in a 1-year certified deposit with Rainier. This deposit was used to secure the loan of $ 400,000. It is well settled that transactions having no economic substance are disregarded for Federal tax purposes. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Rashti Construction Co. v. Commissioner, T.C. Memo. 1988-140 (repayment of a deficit capital account disregarded where repayment lacked economic substance). Petitioner's repayment of his deficit capital account was such a transaction. Petitioner, Mr. Bell, and their various investment vehicles had control of the $ 400,000 at all times through these transfers. See Hallowell v. Commissioner, 56 T.C. 600, 609 (1971); *223 Rollins v. Commissioner, T.C. Memo. 1993-643 (slip op. at 79) (finding it "highly significant" in economic substance analysis that substantial parallel payments back to organizations owned or controlled by taxpayer were made). Petitioner had signature authority over Span Services' Rainier account, into which his $ 400,074 check was deposited. Petitioner also had signature authority, along with Michael J. Maloney, over the Aldergrove account into which the $ 400,074 was deposited. Petitioner had voting control over all Aldergrove partnership matters by virtue of his ownership of 90 percent of Aldergrove's voting units. Petitioner had SAR's in GML allowing him to capture almost all the value of its stock. He even transferred assets previously held elsewhere to GML, presumably in order to integrate those assets into his asset protection plan. Petitioner expected -- and had an understanding with Mr. Bell, director of Span Corp. -- that funds paid by petitioner to Span Services and then to Span Corp., would be invested by Span Corp. in GML. Petitioner was also tax counsel for Span Corp. All accounts involved in the transfers were with Rainier, and *224 all transfers took place on December 27, 1984. Most amounts, including the $ 400,000 loan, resting in Aldergrove were part of petitioner's own asset protection plan and primarily benefited petitioner. The Aldergrove partnership agreement required petitioner to contribute $ 9,000 and GML to contribute $ 570,000 to capital. The loan from Rainier was passed through GML to Aldergrove and constituted $ 400,000 of GML's $ 570,000 capital contribution obligation. [10] *225 The allocation of Aldergrove's profits was subject to a partner vote, over which petitioner had control. Moreover, any profits on the $ 400,000 allocated to GML increased the value of its stock and petitioner's SAR's. In addition, on July 1, 1984, GML assigned its interest in the principal, issues, and profits of Aldergrove to petitioner as security for payment upon any exercise by petitioner of his SAR's. The only other persons who could possibly receive some benefit from the $ 400,000 resting in Aldergrove were Messrs. Bell and Maloney, who also had relatively insignificant SAR's in GML. Thus, the repayment funds never left the effective control of petitioner. [11]
Additional evidence of petitioner's control over this system and its use for his benefit is found in the Span/Hansa Management Co. (Span/Hansa Management) partnership arrangement between petitioner and Aldridge Investments, Ltd., formed on September 1, 1985. Aldridge Investments, Ltd. was an entity owned by Mr. Bell. Aldridge Investments, Ltd. subsequently changed its name to Span Hansa, Ltd., and, on January 1, 1987, assigned *226 its interest in Span/Hansa Management to Hansa Bank & Trust Co., Ltd. (Hansa Bank), an Anguillan corporation owned and controlled by Mr. Bell. One-hundred percent of Span/Hansa Management's income and all capital contributions were allocated to Aldridge Investments, Ltd. (later Span Hansa, Ltd., or Hansa Bank). This was done for the primary purpose of effectuating petitioner's asset protection plan. Once a distribution was made by Span/Hansa Management to Aldridge Investments, Ltd. (or Span Hansa, Ltd., or Hansa Bank), Aldridge would transfer the bulk of the distributed funds to Span Corp. (also owned by Mr. Bell) as a "management fee". Span Corp. would then transfer all funds to GML, which then transferred the funds to Aldergrove Investments. [12] Petitioner was benefited by these funds by virtue of his SAR's in GML, which increased in value with the increase in value of GML's partnership interest in Aldergrove. *227 Ultimately, petitioner's own funds were never involved in the repayment of his Span Services negative capital account. On January 10, 1986, Aldergrove satisfied the December 27, 1984, joint obligation (of Aldergrove and petitioner) by transferring $ 401,392.74 to Rainier. Thus, neither petitioner, nor any entity, used any of its own funds to "repay" the Span Services deficit capital account. The $ 400,000 went from Rainier, to petitioner, through Span Services and various other entities, and back to Rainier without any out-of-pocket payment by petitioner. d. Payment to Aldergrove
Petitioners contend that petitioner then had an obligation to "contribute" to or repay Aldergrove as a result of its satisfaction of the joint $ 400,000 obligation. However, there was no written agreement regarding such an obligation. Petitioner's purported payments to Aldergrove on that "obligation" also lacked economic substance or remained in petitioner's control by virtue of his control over Aldergrove. Petitioner's first payment was made 2 years later, on February 25, 1988, when he transferred $ 125,000 to an Aldergrove account over which he had signature authority. On the same day, pursuant *228 to petitioner's instructions Aldergrove transferred $ 110,200 to Hansa Finance and Trust, B.V. (Hansa Finance), an entity wholly owned and controlled by Mr. Bell. On March 2, 1988, Hansa Finance transferred $ 110,000 to Group M Construction, Inc., a Washington corporation owned by petitioner (from 45 to 50 percent during the years at issue) and his brothers (from 50 to 55 percent during the years at issue). On March 7, 1988, Hansa Finance transferred $ 17,084.46 back to Aldergrove. Petitioner made no additional payments to Aldergrove on the $ 400,000 "obligation" prior to filing his petition in this case on July 8, 1991. He made two additional payments after this time. On December 26, 1991, petitioner transferred $ 25,000 to Aldergrove. On December 18, 1992, petitioner issued a check for $ 250,000 to Aldergrove and a check for $ 212,369 to "Ihatsu Fudosan, Ltd. or Aldergrove Investment". Both checks were deposited into an Aldergrove account over which petitioner had signature authority. [13]
*229 Neither of these additional payments had economic substance. At this time, petitioner's right to exercise his SAR's in GML was unrestricted. The contribution to Aldergrove increased the value of both petitioner's and GML's partnership interest in Aldergrove. Thus, it also increased the fair market value of GML's stock and petitioner's SAR's. Petitioner exercised control over all Aldergrove partnership matters by virtue of his 90-percent voting interest. Numerous other transactions also support the conclusion that funds held in Aldergrove were used by and benefited petitioner personally, including other "loans" to Group M Construction and Chestnut Grove Investments (also partially owned by petitioner) made through Hansa Finance. We find, therefore, that none of the payments made by petitioner to Aldergrove in "repayment" of a purported $ 400,000 loan had economic substance. Petitioner argued at trial and on brief that Mr. Bell had the ability to remove principal from GML or Aldergrove, thus reducing the value of petitioner's SAR's and placing Aldergrove funds beyond petitioner's control. Mr. Bell apparently did make such a transfer only once. However, even in this instance, *230 the bulk of the funds removed were immediately transferred to Group M Construction and later back to Aldergrove. As we have already discussed, petitioner was clearly in control of the activities of both GML and Aldergrove. The money held by Aldergrove was part of petitioner's asset protection plan and primarily benefited petitioner. The allocation of Aldergrove's profits was subject to a partner vote, over which petitioner had control. Moreover, GML assigned its interest in the principal, issues, and profits of Aldergrove to petitioner as security for payment upon any exercise by petitioner of his SAR's. Finally, as discussed above, the formation of Span/Hansa Management, an integral part of petitioner's asset protection plan, provided an additional device by which petitioner obtained the benefits of funds flowing between Aldergrove, Span Corp., and GML. Petitioner was, in fact, the primary beneficiary of transactions between all these entities. The various transfers among entities controlled or owned by petitioner are reminiscent of those with which we have previously dealt. See, e.g., Karme v. Commissioner, 73 T.C. 1163, 1171, 1173-1174 (1980), *231 affd. 673 F.2d 1062 (9th Cir. 1990); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, T.C. Memo. 1986-23, affd. 820 F.2d 1543 (9th Cir. 1987); see also Schiavenza v. United States, 52 AFTR2d 83-6364, 85-1 USTC par. 9155 (N.D. Cal. 1984). In those cases, the taxpayers used foreign and domestic entities to make prearranged "money movements" within the "system" of entities. Karme v. Commissioner, supra at 1169. The funds involved in those money movements never left the system of controlled entities. Typical of the transactions in those cases were key documents that "were not executed, and sometimes not even written in final form, until long after their purported dates", id. at 1191, loans and transfers that were made between system entities to negate risk of loss; lenders that were "continuing to enjoy the use" of funds supplied to other entities, id., at 1193; and back-to-back transfers of funds made within hours of each other all resulting in no net outlay *232 of money by any single entity or person. See Bail Bonds by Marvin Nelson, Inc. v. Commissioner, supra.As in those cases, "It is apparent that petitioner's transactions * * * 'did not appreciably affect [his] beneficial interest except to reduce [his] tax'." Bail Bonds by Marvin Nelson, Inc. v. Commissioner, supra (citing Knetsch v. United States, 364 U.S. 361, 366 (1960), quoting Gilbert v. Commissioner, 248 F.2d 399, 411 (2d Cir. 1957)). We find that respondent has satisfied the burden of proof and that petitioner's repayment of his negative capital account in Span Services lacked economic substance. Therefore, we disregard it for tax purposes and hold that petitioners omitted income for 1984 in the amount determined by respondent. The notice of deficiency is therefore timely and respondent is sustained on this issue. 3. Losses for Delinquent Management Fees
Petitioner's Span Services Termination and Transfer Agreement states: 4. John M. Monahan further agrees to pay the delinquent management fee owing to Span Corp Limited in the amount of *233 $ 170,000.00. It is agreed by the parties that this expense is to be borne individually by John M. Monahan, but that should such expense be attributed to the partnership, that it shall be specially allocated to John M. Monahan, and that this expense is required to be paid to complete the termination of his interest in the partnership.
On December 27, 1984, simultaneously with the transfer of the $ 400,000 loan from Rainier described above, petitioner issued a check for $ 100,000 payable to Span Corp., which immediately transferred the money to GML, which transferred the money to Aldergrove. Aldergrove immediately invested the $ 100,000 in a 1-year Rainier certified deposit. On April 16, 1985, petitioners transferred $ 70,000 from their Rainier account to Span Corp.'s Rainier account. On the same day, Span Corp. transferred $ 70,000 to the Rainier account of GML, which immediately transferred $ 70,000 to Aldergrove's Rainier account. Aldergrove immediately transferred $ 70,000 to the previously opened certified deposit now containing $ 109,000. Petitioners claimed losses from Span Services in the amount of $ 100,000 on their 1984 return and $ 70,000 on their 1985 return. *234 These payments followed paths quite similar to that of the $ 400,000 loan from Rainier. Ultimately, they too rested with Aldergrove. As we have found, petitioner retained control over and benefited from funds held by Aldergrove. Thus, the $ 100,000 and $ 70,000 "losses" were not truly "lost" to petitioners. Petitioners bear the burden of proving their entitlement to these losses, Welch v. Helvering, 290 U.S. 111 (1933). There is no real evidence (other than the Termination and Transfer Agreement) showing that these payments were actually paid to satisfy delinquent management fee obligations or other business expenses. The Management Agreement between Span Services and Span Corp. requires an invoice prior to payment of management fees. There is no such invoice in the record; nor is there evidence that such services were actually undertaken. Petitioner has testified previously under oath that it was his understanding and expectation that the $ 170,000 paid to Span Corp. would be used to capitalize GML. As described above, petitioner used GML as part of his personal asset protection plan. Any payments to that entity increased the value of petitioner's *235 SAR's, thus benefitting him personally and directly. We hold that petitioners have failed to satisfy their burden of proof regarding respondent's disallowance of their losses. Moreover, petitioner's payments to Span Corp. were devoid of economic substance. Therefore, we sustain respondent's determination on this issue. [14]
*236 4. Interest Income
During 1985, Rainier paid $ 46,028.17 to Aldergrove on certified deposit accounts. Petitioners reported a small portion ($ 768) of this interest income on their 1985 return. Respondent contends that petitioners should have included the full amount of interest in income by virtue of petitioner's control over and benefit from the assets of Aldergrove. [15] We agree. Ownership of property (here, property producing income) is determined from all the facts and circumstances. Schoenberg v. Commissioner, 302 F.2d 416, 419 (8th Cir. 1962), affg. T.C. Memo. 1961-235; Hang v. Commissioner, 95 T.C. 74, 80 (1990). In making such determination, "'command over property or enjoyment of its economic benefits marks the real owner.'" Hang v. Commissioner, supra at 80 (quoting Anderson v. Commissioner, 164 F.2d 870, 873 (7th Cir. 1947), *237 affg. 5 T.C. 443 (1945)). Mere legal title is not determinative. Serianni v. Commissioner, 80 T.C. 1090, 1104 (1983), affd. 765 F.2d 1051 (11th Cir. 1985). Petitioner had signature authority and voting control over the Aldergrove accounts into which the interest was paid. Aldergrove was part of petitioner's asset protection plan. As noted above, petitioner benefited through several transactions from assets held by Aldergrove and had the ability to capture the value of those assets by virtue of his SAR's in GML. Thus, payments of interest to Aldergrove were essentially payments to petitioner and includable in the income of petitioners. [16] *238 See Commissioner v. Smith, 136 F.2d 556 (2d Cir. 1943), revg. in part 42 B.T.A. 505 (1940); National Lead Co. v. Commissioner, 40 T.C. 282, 303 (1963), affd. in part and revd. in part 336 F.2d 134 (2d Cir. 1964). We sustain respondent on this issue as well. [17]
5. Interest Payments to Hansa Finance
Respondent disallowed interest deductions to petitioners as follows: Taxable Year
Payee Deduction 1987
Hansa Finance & Trust
$ 32,917
1988
Ihatsu Fudosan Capital, Ltd.
[1] 16,375
Petitioners reported these deductions as mortgage interest payments on an alleged loan (made January 10, 1986) of $ 150,000 from Hansa Finance. Ihatsu Fudosan is the successor in interest to Hansa Finance on the purported loan. Both entities were wholly owned by Mr. Bell. The funds for the loan were actually provided to petitioners by Hansa Bank, another Bell-controlled entity. However, petitioners signed the $ 150,000 note in favor of Hansa Finance and made payments to Hansa Finance and Ihatsu Fudosan as listed above. The loan note was secured by an unrecorded deed of trust *239 on petitioners' residence. Petitioners concede that the payments at issue are not deductible as mortgage interest because the deed of trust was not recorded. See sec. 1.163-10T(o)(1)(iii), Temporary Income Tax Regs., 52 Fed. Reg. 48417 (Dec. 22, 1987). Petitioners contend, however, that they are entitled to deduct a portion of the payments as personal interest under section 163(h). Respondent argues that, like the other transactions described above, this too lacked economic substance. We agree. Where a taxpayer's indebtedness is not bona fide, no deduction is allowed for any purported interest payments made on that debt. Muserlian v. Commissioner, 932 F.2d 109, 113 (2d Cir. 1991), affg. T.C. Memo. 1989-493. To determine whether indebtedness is bona fide, we must look to the substance of that transaction. Id. As with the transactions described above, the ultimate source and resting place for the $ 150,000 was Aldergrove. On January 10, 1986, from a Rainier account over which petitioner had previously exercised signature authority, Aldergrove made a transfer of $ 150,000 to the Rainier *240 account of Hansa Bank, which immediately made the $ 150,000 transfer described above to the Rainier account of petitioners. On the same day, petitioners transferred $ 155,000 to Hansa Bank's Rainier account, and Hansa Bank immediately transferred $ 155,000 back to Aldergrove. The February 26, 1987, and December 22, 1988, "interest" payments made by petitioners on the purported loan were also immediately transferred by Hansa Finance or Ihatsu Fudosan to Aldergrove. [18] Thus, petitioner essentially "borrowed" money over which he already had control. See Goldstein v. Commissioner, 364 F.2d 734, 741-742 (2d Cir. 1966), affg. 44 T.C. 284 (1965). On December 18, *241 1992, petitioners issued a check for $ 212,369 payable to "Ihatsu Fudosan Ltd. or Aldergrove Investment." Petitioner testified at trial that this was the final payment on the home mortgage. As before, this check was deposited to an Aldergrove account over which petitioner had signature authority. We find that these various payments by petitioners lacked economic substance. [19] Petitioner testified that the "mortgage" on his home was part of his asset protection plan, and that by reducing his equity in his home, he hoped to replace an "unknown liability that could take the house away" with a "known liability that you know you can repay," i.e., the "loan" note. Petitioner neglected to complete the picture in his testimony however. For any real protection to occur, petitioners would have also had to transfer the equity, or loan amount to a place unreachable by "unknown" creditors. From our analysis of the above transactions, it appears that petitioners did just that by transferring equity through Hansa Finance (or Ihatsu Fudosan) to Aldergrove. This fits squarely into petitioner's own testimony, since petitioner believed that assets held in Aldergrove were protected. Of course, *242 petitioner had to have access and control over Aldergrove's assets to make the plan truly beneficial to him. He did, through his security interest in GML's Aldergrove capital and profits, and through his SAR's in GML. Thus, the purported loan amount was never outside of petitioner's dominion and control and the principal and interest payments made by petitioners were nothing more than transfers from one beneficially owned account to another. We therefore sustain respondent on this issue. 6. Additions to Tax
Respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a) for all the years at issue. *243 Section 6653(a) imposes a 5-percent addition to tax if any part of any underpayment of tax required to be shown on a return is due to negligence or intentional disregard of rules or regulations. Respondent's determination is presumed correct and petitioners bear the burden of proving otherwise. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Negligence within the meaning of section 6653(a) has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). If a taxpayer shows good faith reliance upon the advice of a competent and experienced accountant or attorney in the preparation of a tax return, the addition to tax for negligence does not apply. Conlorez Corp. v. Commissioner, 51 T.C. 467, 474-475 (1968). To show good faith reliance, the taxpayer must establish that the return preparer was supplied with all necessary information and that the incorrect return resulted from the preparer's mistakes. Pessin v. Commissioner, 59 T.C. 473, 489 (1972). *244 Petitioner engaged in ongoing sham transactions devoid of economic substance during each of the years at issue. He is a highly sophisticated taxpayer, well-educated and experienced in the complexities of the tax law. On the basis of the record as described above, we reject petitioners' contention that they had a reasonable basis for the positions taken on their returns. We therefore sustain respondent's determination with regard to this addition. Respondent also determined that petitioners are liable for additions to tax for 1984 through 1987 under section 6661. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b). The amount of the understatement may be reduced under section 6661(b)(2)(B), for amounts adequately disclosed or supported by substantial authority. Respondent's determination of the addition to tax is presumed correct and petitioners *245 bear the burden of proving otherwise. Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Bixby v. Commissioner, supra at 791-792. Petitioners understated their income tax by more than $ 5,000 in each of the years 1984 through 1987. Petitioners did not make any statement regarding the Termination and Transfer Agreement on any of the returns at issue. Indeed, their returns contradict the positions they took with regard to that transaction. The authority cited by petitioners on brief does not support their positions. We therefore sustain respondent's determination. Respondent also determined that petitioners are liable for increased interest under section 6621(c) for all the years at issue. Section 6621(c) increases the interest rate to 120 percent of the statutory rate on substantial underpayments that exceed $ 1,000 and are attributable to "tax motivated transactions". Tax motivated transactions include "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). We have held that petitioner engaged in sham transactions lacking in economic *246 substance. Based on the findings set forth herein, and the fact that the underpayment of tax will exceed $ 1,000 for each of the years at issue, section 6621(c) is applicable to the underpayments with respect to those transactions that we have found to be shams. See Price v. Commissioner, 88 T.C. 860, 888-889 (1987) (as amended), affd. without published op. (10th Cir. Oct. 26, 1990). Decision will be entered under Rule 155.
Footnotes
1. In their petition, petitioners also contend that this Court lacks jurisdiction over certain items at issue for 1984 and 1985 due to respondent's failure to issue a notice of final partnership administrative adjustments (FPAA). Petitioners raise this issue on brief only with regard to their deductions for delinquent management fees. Petitioners' opening brief devotes a total of two sentences to the issue. The reply brief devotes one sentence and a footnote. Even then, petitioners only raise the issue "To the extent that Respondent argues that these [items] are partnership items". Respondent does not so argue. We take petitioners' limited employment of this argument to mean that they have abandoned it with regard to the remaining issues.↩
2. Petitioner has an accounting degree from Seattle University, a law degree from Gonzaga University, and an LL.M. (with emphasis in taxation) from New York University. From 1979 through 1988, petitioner established and managed the tax department for a Seattle law firm. He became managing partner of that firm in 1988.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Span Services conducted no activity during and after 1984, due in part to disagreements between Robert T. Edwards and Lynwood S. Bell. Span Services had no income during 1984.↩
5. On Mar. 28, 1990, petitioner testified several times under oath, and in the presence of his attorney, that he terminated his Span Services partnership interest during 1984.↩
6. Petitioners did not present any available witnesses (such as members of petitioner's old firm, by which the Termination and Transfer Agreement was drafted) to support their testimony. See Wichita Terminal Elevator Co. v. Commissioner, 162 F.2d 513 (10th Cir. 1947), affg. 6 T.C. 1158↩ (1946).
7. In addition, Span Services' unaudited financial statements for the year ended Dec. 31, 1984, list petitioner as a partner during that year. The notes to those financial statements state: NOTE 1 - PARTNERS' CAPITAL ACCOUNTS
Pursuant to Termination and Transfer Agreements the following transfers occurred within the Partnership during 1984: 1] By Agreement dated January 1, 1984 John M. Monahan transferred his 45% capital and profit interest to Edwards Holdings Limited in consideration of a) Edwards Holdings Limited agreement to assume John M. Monahan's pro rata share of the liabilities of the Partnership,↩
8. Petitioner's initial basis in Span Services was zero, because he made no initial capital contributions. Sec. 722. Petitioner was a general partner and was allocated partnership recourse liabilities in the same proportion as his distributive share of partnership losses (45 percent). Sec. 1.752-1(e), Income Tax Regs. Petitioner claimed partnership losses on his 1982 Federal income tax return that reduced his basis to zero. See sec. 705(a)(2)(A). Span Services increased its recourse liabilities by $ 1,572,760 during 1983. Petitioner's 45-percent share of this increase was $ 707,742. Sec. 1.752-1(e), Income Tax Regs. Petitioner claimed $ 113,297 in partnership losses from Span Services on his 1983 Federal income tax return. These 1983 events lead to a basis calculation for petitioner as follows: Beginning basis Jan. 1, 1983.
$  0 Share of increased liabilities
increases basis.
707,742 Secs. 752(a), 722.
Losses claimed on return
decreases basis.
Sec. 705(a)(2)(A).
(113,297)
Ending basis
$ 594,445 The record supports, and we hold, infra↩, that petitioner was allocated no further income or losses of the partnership after 1983. Nor is there evidence of any capital contributions or distributions made by or to petitioner after 1983. Thus, his ending 1983 basis remained his basis until he terminated his interest.
9. Petitioners contend that respondent did not rely on this theory in the notice of deficiency or prior to trial. We disagree. The notice of deficiency bases the $ 400,074 adjustment on three theories, including: "discharge of indebtedness * * * upon the exchange or termination of your interest in * * * [Span Services]." Respondent's primary argument at trial and on brief continues to be that petitioners must recognize gain due to relief of liabilities in excess of basis upon the sale of petitioner's interest in Span Services. Respondent's use of the "sham transaction" rationale is merely a response to petitioners' own contention that petitioner restored his deficit capital account. Many of the 215 joint exhibits -- which were prepared by both↩ parties prior to trial -- deal with the substantiation of petitioner's alleged repayments and the entities through which they were channeled. Petitioner, a sophisticated tax practitioner and attorney, had ample notice that the theory in question would be the focus of this case.
10. The remaining $ 170,000, discussed infra↩, consisted of the payments by petitioner for "delinquent management fees" under the Termination and Transfer Agreement. These payments took a path through the various entities almost identical to the $ 400,000.
11. This was true even during the instant where the funds momentarily passed through the account of Span Corp., an entity owned by Mr. Bell and an integral part of petitioner's system of entities. All entities in this system did, in fact, move all the income at issue to entities through which petitioner could access the funds. See National Lead Co. v. Commissioner, 40 T.C. 282, 303 (1963), affd. in part and revd. in part 336 F.2d 134↩ (2d Cir. 1964) (tax effect of asset transfer disregarded where taxpayer had continued domination and control of assets through stock ownership in entity to which assets transferred).
12. Another example of the benefit received in this arrangement by petitioner is his initial capital contribution to Span/Hansa Management. The partnership agreement called for petitioner to make initial capital contributions of $ 45,000. On Dec. 30, 1985, petitioner issued a check for $ 45,000 to the Rainier account of Hansa Bank & Trust Co., Ltd (Hansa Bank), That check bore the notation "Span Hansa Management". On Dec. 31, 1985, pursuant to instructions by petitioner, Hansa Bank transferred $ 45,000 from its Rainier account to the Rainier account of Aldergrove. These transactions also benefited Mr. Bell, since he owned both the stock of GML and a small percentage of its SAR's. Any amounts petitioner contributed to Span/Hansa ultimately passed through GML to Aldergrove, thus increasing the value of both GML stock and SAR's owned by Mr. Bell. Thus, it was in Mr. Bell's financial interest to continue to transfer amounts in this fashion to Aldergrove. Other evidence and stipulations show various amounts being transferred between petitioner, Aldergrove, Hansa Finance, and entities partially owned by petitioner and his brothers (i.e., Chestnut Grove Investments, Inc. and Group M Construction, Inc.). These facts also support respondent's contention that petitioner benefited directly from funds held by Aldergrove.↩
13. Also on Dec. 18, 1992, Group M Construction issued a check to the order of "Ihatsu Fudosan or Aldergrove Investment Company" in the amount of $ 510,400. This check was deposited into the same Aldergrove account, over which petitioner had signature authority.↩
14. We agree with respondent that Span Services was not a "partnership" for which a notice of final partnership administrative adjustments (FPAA) was required because it was not required to file a return under sec. 6031(a). See sec. 6231(a)(1)(A). Span Services carried on no business in the United States and derived no United States sourced income during 1984 and 1985. See Atlantic Veneer Corp. v. Commissioner, 85 T.C. 1075, 1081-1084 (1985), affd. 812 F.2d 158 (4th Cir. 1987); sec. 1.6031-1(d), Income Tax Regs. Nor is there any indication that Span Services made elections such that the exception in sec. 1.6031-1(d)(2), Income Tax Regs.↩, applied during 1984 or 1985. Finally, petitioner has previously asserted to respondent in writing that the items at issue were not related to expenses of Span Services, but were expenses of the Termination and Transfer Agreement. Thus, such items could not be partnership items to which an FPAA would be applicable.
15. Aldergrove did not file a U.S. Partnership Return of Income for 1985.↩
16. Petitioners paid and deducted $ 42,583 in interest on the loan that created the $ 400,000 certificate of deposit held by Aldergrove. Notably, this amount corresponds closely to the amount of interest which was received by Aldergrove and which we find was controlled by petitioner.↩
17. Because we have sustained respondent on all issues concerning petitioners' 1984 and 1985 income, we must also sustain respondent's determination regarding income averaging for petitioners' 1986 income.↩
1. (reduced to $ 6,550 after the personal interest expense limitation).↩
18. As with the $ 150,000, the amounts transferred to Aldergrove differed slightly from the amounts paid as purported interest by petitioners to Hansa Finance and Ihatsu Fudosan. On both payments, petitioners paid $ 17,253.69, and Hansa Finance or Ihatsu Fudosan transferred $ 17,084.46 to Aldergrove.↩
19. Petitioners also made a Dec. 30, 1987, payment that was deposited to a Hansa Finance account outside the United States and was not traceable. Given petitioners' previous payment history, however, and the fact that petitioners presented no evidence to support the deduction of this payment, we are not inclined to view this payment in the manner urged by petitioners.↩